MaddeN, Judge,
delivered the opinion of the court:
The plaintiff made a contract, dated February 18,1950, to clear the trees, brush and debris from a large area of land within the reservoir area of Whitney Dam on the Brazos Kiver in Texas. At the time the plaintiff’s contract was made, Whitney Dam was under construction, but the river and its tributary creeks were still flowing naturally. The plaintiff’s work was, under the terms of the contract, to be completed by June 29,1950.
The plaintiff’s bid was imprudently low. It was $79,600. The Government’s estimate of what the work should cost, without profit, had been $222,884. Of the 18 bids submitted, all but four were larger than the Government’s estimate. *725 Recognizing that the work could not be done at the plaintiff’s bid price, the Government offered to let the plaintiff withdraw its bid, but the plaintiff decided to let it stand, and took the contract at its bid price.
The plaintiff’s performance was slower than would have been required to complete the contract on time, but a report from the office of the Government’s resident engineer stated that on May 27 the work was only approximately 15 days behind schedule.
As a step in the construction of the main dam by the dam contractor, a cofferdam was built to divert the river through sluiceways in the completed portion of the dam so that the missing section of the dam through which the river had been flowing could be constructed. On May 20, 1950, with less than 24 hours’ notice to the plaintiff, the cofferdam was closed and the level of the water at the dam was raised about 20 feet. The land to be cleared by the plaintiff extended from the dam up the river about eleven miles. Because of the fall of the river, the rise caused at the upper end of the clearing area was only about one foot.
The rise in the water level caused great difficulties for the plaintiff. Trees which had been felled but not yet pushed together by bulldozers and burned had to be pulled out of the wet area with cables operated with winches on more powerful bulldozers. The plaintiff did not have that type of equipment, and had to buy or rent it. The process was slower and required more men than did the process of pushing trees together with lighter equipment.
We have found that, but for the difficulties created by the unanticipated closing of the cofferdam, the plaintiff would have had its work substantially completed by July 18. The plaintiff’s costs incurred after July 13 and before completion and acceptance of its work on November 29, were $92,952.36. The plaintiff urges that it is entitled to a judgment for that amount.
The Government’s conduct in permitting the flooding of the area of the plaintiff’s work with no adequate warning to the plaintiff was completely inconsiderate of the interests of the plaintiff. Its explanation lies, no doubt, in the fact that the dam contract involved infinitely larger sums and interests *726 than did the plaintiff’s contract. But if the flooding of the plaintiff’s work was necessary in order to avoid delaying the dam contractor’s more expensive work, with possible liability of the Government for the delay, the plaintiff ought not to have to suffer the cost of this advantage to the Government.
The inconsiderate conduct was a breach of that term which every contract contains, by fair implication, that one party to a contract will not impede performance by the other party. If, within the terms of the contract, the contracting officer had the power to make an equitable adjustment to pay the damages caused by the breach, the officer should have made a fairly equitable adjustment. If, because it was a situation involving unliquidated damages, the contracting officer did not have authority to give relief, his decision and that of the reviewing board had no finality. We will not construe a contract as giving an administrative officer authority to decide a case against a claimant, but no power to decide it in his favor.
There is not much to be said for the plaintiff’s method of proving its damages. The fact that it spent $92,952.36 after July 13, the date on which, but for the flooding, it could have completed the contract, does not prove much. Post hoc ergo frof ter hoc is neither good logic nor good law.
Both the cost of the work in its latter stages and the length of time consumed are difficult to understand. There was not a great deal of work close to the streams left to be done when the cofferdam was closed. What there was to be done was made very difficult and expensive, but it does not come near to accounting for what the plaintiff did expend. It may be that the work was somewhat demoralized by the newly created difficulties, and was allowed to drag along inefficiently. In view of the condition of the evidence, we can only estimate the recoverable damages, and we find them to be $40,000.
The contracting officer, by change order, increased the contract price by $6,054, as compensation for what he described as additional work directed to be performed at certain low points in the reservoir area. It is not clear whether this sum has been paid. If it has been, it should be deducted from *727 the figure of $40,000 named above, and the judgment should include only the remainder after the deduction.
There was deducted $7,650 from the contract price for liquidated damages for 153 days’ lateness in completion, at $50 per day. The change order mentioned above extended the plaintiff’s time by 34 days and thus eliminated $1,700 from this charge. We do not know whether the plaintiff received the $1,700. If not, it should be added to the amount arrived at as directed above. We conclude, further, that the plaintiff’s time should have been extended 45 days more, a total of 79 days. The sum of $2,250 will be included in the judgment on that account.
The plaintiff is entitled to recover and judgment will be entered to that effect. The amount of recovery will he determined pursuant to Eule 38 (c).
It is so ordered.
Eeed, Justice {Bet.), sitting by designation; Laramoke, Judge, Whitaker, Judge, and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff, Volentine & Littleton, Contractors, is and at all times herein material has been a partnership, composed of M. O. Volentine, who resides in Newport, Arkansas, and Earl Littleton, whose address is Norfolk, Virginia.
2. Under date of February 18, 1950, the plaintiff entered into lump-sum contract No. DA-41-243-eng-453 with the Corps of Engineers, United States Army, Galveston District, Texas, in the amount of $79,600.00, whereby plaintiff would furnish all plant, labor, materials, and equipment required in performing all work in strict accordance with the specifications, schedules and drawings in connection with clearing the timber, brush and debris from an area within the Eeservoir of Whitney Dam. Whitney Dam is located on the Brazos Eiver in Hill County, Texas, approximately 38 river miles upstream from Waco, McLennan County, Texas.
3. It was provided in the contract that work would begin *728 within 10 calendar days after the date of receipt by plaintiff of notice to proceed and the project was to be completed within 120 days. Plaintiff received the notice to proceed on March 1, 1950, which determined the completion date as on or before June 29, 1950. Paragraph SC-2 of the Specifications provides that the contractor shall pay the Government as liquidated damages the sum of Fifty (50) Dollars for each calendar day of delay until the work is completed or accepted. Work was commenced by the plaintiff at its own risk on February 16, 1950, and the contract was completed and accepted on November 29, 1950. Liquidated damages in the amount of $7,650.00, representing 153 days delay from June 29, 1950, were withheld by the contracting officer. Subsequently, the contracting officer remitted liquidated damages in the amount of $1,700.00 representing 34 days of the delay. The proposed payment was not accepted by the plaintiff.
4. Pertinent provisions of the contract include the following:
Abitóle 3. Changes. — The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of this'contract within the general scope thereof.' If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. Any claim for adjustment under this Article must be asserted within 10 days from the date the change is ordered: Provided, however, That the Contracting Officer, if he determines that the facts justify such action, may receive and consider, and with the approval of the Secretary of War or his duly authorized representative, adjust any such claim asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in Article 15 hereof. But nothing provided in this Article shall excuse the Contractor from proceeding with the prosecution of the work so changed.
Article 4. Changed conditions. — Should the Contractor encounter, or the Government discover, during the progress of the work subsurface and/or latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications, or unknown conditions of an unusual nature differing materially from *729 those ordinarily encountered and generally recognized as inhering in work of the character provided for in the plans and specifications, the attention of the Contracting Officer shall be called immediately to such conditions before they are disturbed. The Contracting Officer shall thereupon promptly investigate the conditions, and if he finds that they do so materially differ the contract shall, with the written approval of the Secretary of War or his duly authorized representative, be modified to provide for any increase or decrease of cost and/or difference in time resulting from such conditions.
Article 9. Delays — Damages. * * *
(c) Time Extensions. — The right of the contractor to proceed shall not be terminated as provided in this article, nor the contractor charged with liquidated or actual damages, because of any delays in the completion of the work due to causes which he could not reasonably have anticipated and which were due to causes beyond his control and without his fault or negligence, including, but not restricted to, acts of God, or of the public enemy, acts of the Government either in its sovereign or contractual capacity, acts of another contractor in the performance of a contract with the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargo, and unusually severe weather, or delays of subcontractors due to such causes; provided, however, that the contractor shall promptly notify the contracting officer in writing of the causes of such delay. Upon receipt of such notification the contracting officer shall ascertain the facts and the extent of such delay and, if in his judgment the facts so justify, shall extend the time for completing the work commensurate with the period of excusable delay. The contracting officer’s findings of fact thereon shall constitute his decision which shall be final and conclusive on the parties hereto subject to appeal by the contractor within thirty (30) days therefrom as provided in the “Disputes” article herein.
Article 15. Disputes. — Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the contracting officer subject to written appeal by the contractor within 30 days to the head of the department concerned or his duly authorized representative whose decision shall be final and conclusive upon the parties hereto. In the meantime the contractor shall diligently proceed with the work as directed.
Article 16. Payments to Contractor. — (a) Unless otherwise provided in the specifications, partial pay *730 ments will be made as the work progresses at the end of each calendar month, or as soon thereafter as practicable, on estimates made and approved by the Contracting Officer. In preparing estimates the material delivered on the site and preparatory work done may be taken into consideration.
Pertinent provisions of the Specifications include the following:
GC-1. Scope of Work. — The work to be performed under this contract consists of furnishing all plant, materials, equipment, supplies, labor and transportation, including fuel, power, water (except any materials, equipment, utility or service, if any, specified herein to be furnished by the Government), and performing all work as required by Article I of the contract, in strict accordance with the specifications, schedules, and drawings, all of which are made a part hereof, and including such detail drawings as may be furnished by the contracting officer from time to time during the prosecution of the work in explanation of said drawings.
GC-3. Site Investigation and Representations. — The contractor acknowledges that he has satisfied himself as to the nature and location of the work, the general and local conditions, particularly those bearing upon transportation, disposal, handling and storage of materials, availability of labor, water, electric power, roads and uncertainties of weather, river stages, tides or similar physical conditions at the site, the conformation and condition of the ground, the character, quality and quantity of surface and subsurface materials to be encountered, the character of equipment and facilities needed preliminary to and during the prosecution of the work and all other matters, which can in any way affect the work or the cost thereof under this contract. Any failure by the contractor to acquaint himself with all the available information concerning these conditions will not relieve him from responsibility for estimating properly the difficulty or cost of successfully performing the work. The Government assumes no responsibility for. any understanding or representations made by any of its officers or agents during or prior to the execution of this contract, unless (1) such understanding or representations are expressly stated in the contract and (2) the contract expressly provides that responsibility therefor is assumed by the Government. Representations made but not so expressly stated and for which, liability is not expressly assumed by the Government in the contract shall be *731 deemed only for tbe information of the contractor and the Government will not be liable or responsible therefor.
# & # H*
GC-5. Progress Charts, and Requirements for Overtime Work.
(a) The contractor shall within five days or within such time as determined by the contracting officer, after date of commencement of work, prepare and submit to the contracting officer for approval a practicable schedule, showing the order in which the contractor proposes to carry on the work, the date on which he will start the several salient features (including procurement of materials, plant and equipment) and the contemplated dates for completing the same. The schedule shall be in the form of a progress chart of suitable scale to indicate appropriately the percentage of work scheduled for completion at any time. The contractor shall enter on the chart the actual progress at the end of each week or at such intervals as directed by the contracting officer, and shall immediately deliver to the contracting officer three copies thereof.
(b) The contractor shall furnish sufficient forces, construction plant and equipment, and shall work such hours, including night shifts and overtime operations as may be necessary to insure the prosecution of the work in accordance with the approved progress schedule. If, in the opinion of the contracting officer, the contractor falls behind the progress schedule, the contractor shall take such steps as may be necessary to improve his progress and the contracting officer may require him to increase the number of shifts, and/or overtime operations, days of work except Saturdays, Sundays, and holidays, and/or the amount of construction plant, all without additional cost to the Government. Provided, that the provisions of this paragraph shall not be construed as §rohibiting work by the contractor if he so elects on aturdays, Sundays or holidays.
(c)Failure of the contractor to comply with the requirements of the contracting officer under this provision shall be grounds for determination by the contracting officer that the contractor is not prosecuting the work with such diligence as will insure completion within the time specified. Upon such determination the contracting officer may terminate the contractor’s right to proceed with the work, or any separable part thereof, in accordance with the delays-damages article of the contract.
*732 GC-7. Possession Prior to Completion. — The Government shall have the right to take possession of or use any completed or partially completed part of the work. Such possession or use shall not be deemed an acceptance of any work not completed in accordance with the contract. If such prior possession or use by the Government delays the progress of the work or causes additional expense to the contractor, an equitable adjustment in the contract price and/or time of completion will be made and the contract shall be modified in writing accordingly.
‡ ‡ $
SC-2. Liquidated Damages. — In case of failure on the part of the contractor to complete the work within the time fixed in the contract or any extensions thereof, the contractor shall pay the Government as liquidated damages the sum of fifty (50) dollars for each calendar day of delay until the work is completed or accepted.
* # % *
TP-2. Gutting Timber. — All trees, stumps, and all brush more than twelve (12) inches in height within the areas shown on the drawings and as marked in the field shall be cut down to within one foot of the natural ground on the high side, and all materials of a combustible nature, including standing timber, dead timber, logs, snags, uprooted trees, driftwood, and all other combustible material, shall be piled and burned or otherwise disposed of as provided in these specifications. Where the fire hazard is not too great and where suitable fire lanes have been cut by the contractor, the contractor will be permitted to burn standing timber without first cutting the timber. Between elevation 505.0 feet and 525.0 feet all trees and brush shall be cut to within 1 foot measured on the high side above the adjacent ground. Below elevation 505.0 feet, the top elevations of stumps and brush shall not exceed elevation 506 feet. No clearing will be required below elevation 505 except where the height of trees or brush exceeds elevation 506. Wherever practicable, all trees shall be felled away from water. No trees or parts of trees shall be allowed to remain in streams or stream-beds. Stumps need not be pulled or roots of undergrowth grubbed. The contractor will not be required to remove any existing buildings or improvements, except fences, from any land within the areas to be cleared under this contract. Olearmg shall commence at the lower limits of the area and proceed upstream for the *733 full width of the area to he cleared unless otherwise approved in writing.
TP-3. Disposal of Cleared Materials.
(a) Only such, clean-up which can be done by mechanical equipment will be required. All materials to be burned shall be piled, and when in suitable condition, shall be burned as approved. Piling for burning shall be done in such manner and in such locations as will cause the least fire risk. The burning, or other approved methods of disposal of the cleared materials shall closely follow the felling and clearihg process, so that in case of high water or pool inundation the brush or other debris will not be washed into the channel, or so that the amount of drift will be held to a minimum. The time, location, and amount of burning or disposal of felled and cleared materials shall be subject to approval. All fence material removed within the clearing areas shall become the property of the contractor and shall be removed from Government-owned and/or leased property, [as amended]
‡ ‡ ‡
TP-4. Partial Payments. — Payments will be made in accordance with Article 16 of the contract. Estimates for partial payments will be based on the percentage of completion of clearing and disposing of all cleared materials. Such estimates will be made by the contracting officer. The lump sum price stated in the contract will be full and final compensation for all work and services under this contract.
5. The Whitney Dam was constructed under a separate contract with another contractor and, at the time bids were advertised for the clearing contract, a considerable amount of construction work on the dam had been accomplished. This fact could be determined by anyone visiting the site of the dam at that time (January 1950). It was common knowledge that a cofferdam would be constructed but the exact date was not known.
The plaintiff’s contract provided that the clearing would commence at the. lower limits of the area and proceed upstream for the full width of the area to be cleared unless otherwise approved in writing. Contract plans indicate that the work was divided into Segments A, C, and F in that order, starting with Segment A immediately above the dam. Segments A and C required clearing on the right bank and *734 adjacent areas only of the Brazos River in Hill County. Segment F only required clearing on the left bank and adjacent areas of the river in Bosque County at the upper extremity of the contract requirement and immediately below the old MKT railroad bridge. The area to be cleared in each segment is shown by a dot and connecting dash line on the three contract plans (1/1, 1/2, and 1/3). A substantial amount of the area to be cleared was along the banks of Towash Creek, Cedrón Creek, and other areas extending a considerable distance from the stream bed of the Brazos River.
Proceeding upstream from the dam at river mile 442.4, the river makes a bend to the right known as Lofers Bend. The river then makes a bend to the left known as Walling Bend. The mouth of Towash Creek is opposite Walling Bend at river mile 445.8 and 3.4 river miles from the dam. A bridge on Texas Highway 22 crosses the river 1.5 river miles upstream from the mouth of Towash Creek. On the contour map (plaintiff’s Exhibit 7) it is designated as “Greenwade Bridge.” There is an area of approximately 150 acres situated on the right, or Hill County, side of the river between river miles 448.4 and 449.5, known as McCown’s pasture. The next bend in the river to the right encompasses the area known as McCown Valley. Across the river from this valley is a high bluff known as Bee Bluff. Around the last mentioned bend, and on the left, or Bosque County, side of the river, Cedrón Creek empties into the Brazos at river mile 452.9. The old MKT bridge, and the liimts of the clearing contract, are 0.6 miles above the mouth of Cedrón Creek at river mile 453.5.
6. The contract requirement, as set forth in paragraph TP-2 of the specifications quoted in Finding 4, was'that “between elevations 505.0 feet and 525.0 feet all trees and brush shall be cut to within one foot on the high side, above the adjacent ground. Below elevation 505.0 feet, the top elevations of stumps and brush shall not exceed elevation 506 feet. No clearing will be required below elevation 505 except where the height of trees or brush exceeds elevation 506.” Any trees or brush which extended above elevation 506 had to be cut at the stump, decked and burned unless the con *735 tractor elected to top off the trees and brush at elevation 506 and deck and bum the resulting debris. Any trees and brush originating between the 505 and 525 contours were required to be cut to within one foot on the high side, then decked and burned. Although the contract plans show no contour elevations, the dot and connecting dash line, which delineates the limits of the work area, apparently indicates the contour elevation of 525 feet.
The average height of banks of the Brazos Biver was approximately elevation 455. Generally speaking, only the large trees located thereon which exceeded 50 feet in height had to be cut, decked and burned under the contract. It was obviously necessary, however, to cut some smaller trees to facilitate the use of bulldozers in the area. It is not established by the record that the contractor wasted any time by any cutting which was not required by the contract.
7. A cofferdam was constructed and closure effected on May 20,1950, with less than twenty-four (24) hours advance notice to plaintiff. The river flow was diverted through sluice gates which had an invert elevation of 449 feet at the dam. As a direct result of closing of the cofferdam, the pool elevation immediately upstream of the dam was raised approximately 20 feet. Because of the fall of the river the resulting rise at the old MKT bridge at the upper extremity of the clearing work was about 1 foot. That point was more than eleven (11) miles up the river from the dam. On June 2,1950, the impounded water reached elevation 455.8. It thereafter subsided, slightly and, during the period of the clearing work, fluctuated between approximate elevation 452 and 456 except on four occasions when rains in the upper Brazos watershed caused rises in the pool elevation. On July 15, the water rose to elevation 463.3. On July 29 it rose to elevation 468.2; on August 6 to elevation 459 and on September 20 to elevation 462.6. Each rise in the water elevation was followed by a recession back to the pool elevation resulting from diversion of the river flow through the sluice gates at the dam. The contracting officer subsequently extended the plaintiff’s contract time 20 days because of the flood stages which were attributed to rainfall.
*736 8. On August 5,1950, the plaintiff filed a claim for waiver of liquidated damages and requested an increase of $93,403.75 in the contract price as an equitable adjustment to compensate for additional costs alleged to have been incurred by reason of the dam closure and the resultant rise in pool elevation in the area of plaintiff’s clearing operations. On January 18, 1951, the plaintiff was granted a hearing before the contracting officer before that official made a decision on the claim. At that hearing, plaintiff presented a revised claim requesting a waiver of liquidated damages and increased cost of $133,-627.43, plus 15 percent profit, as an equitable adjustment of the contract price. The contracting officer made his decision on February 15,1951. In that decision, and in his later Findings of Fact dated April 5,1951, to the Chief of Engineers, he found as facts that—
(1) The plaintiff had failed to follow the contract requirement for felling trees away from the stream beds;
(2) Had failed promptly to remove trees from stream beds;
(3) Had failed to follow up felling closely with decking, burning and clean-up operations, and _
_ (4) Had failed to commence clearing operations at the lower limits of the area and proceed upstream for the full width of the area to be cleared.
The contracting officer further found that, had the plaintiff proceeded in accordance with the contract requirement, no work would have been affected by dam closure on May 20 1950, and no additional cost incurred except the following:
Felling — Mill site to Highway Bridge % mile- $200.00
Towash Creek to Highway Bridge 1% miles- 467. 00
Subtotal- 667.00
Decking — Upstream 25 percent of Segment C- 5,187.00
Burning_ 200.00
Total___ 6,054.00
The contracting officer found that the amount of $6,054.00 was due the plaintiff for extra work caused by closure of the dam. He also found that an extension of time of 34 days was allowable, 5 of which were due to delays in securing rights-of-entry; and 9 due to felling and redecking operations *737 due to floods on the Brazos Biver, including time required to dry.
Thereafter, the contracting officer issued Change Order No. 1 in the amount of $6,054.00, which also extended the contract time 34 days.
9. The plaintiff timely appealed the decision of the contracting officer. After a hearing before the Corps of Engineers Claims and Appeals Board, that Board, on November 18, 1952, rendered its decision denying plaintiff’s claim, except as it has been allowed by the contracting officer in the amount of $6,054 for extra work and an extension of 34 days in contract time. As to facts (1) and (2) of the contracting officer (Finding No. 8), it is shown that these allegations are supported by evidence that on a few occasions the project engineer complained that plaintiff failed to follow the specifications relating to the felling of trees away from the stream beds. These instances occurred in March 1950 and April 1950, and corrective action was taken before the closure of the dam. Many of the so-called trees were in fact only cedar bushes, four or five feet high, which when cut fell into or toward Cedrón Creek. These items had little, if any, direct relationship to the additional cost incurred by plaintiff after the closure and were never a major problem.
With respect to finding (3) of the contracting officer, the evidence indicates that the plaintiff was somewhat behind with the decking and burning and clean-up operations as of May 20,1950. It is to be noted, however, that the contracting officer made the following statement in his findings:
Had the cofferdam not been constructed the water would have been contained in the banks of the river and would not have flooded the pasture lands in which appellants were performing clearing operations.
There are also for consideration certain letters and reports now in the record, signed by or on behalf of the Besident Engineer as follows:
1. Letter to plaintiff dated April 13, 1950 stated that the contractor was falling behind schedule.
2. Beport dated April 17,1950, stating that, after complaint in letter of April 13,1950, “the contractor has started two bulldozers removing trees from Towash Creek.”
*738 3. A report (April 24, 1950) stated that “using a straight line as progress schedule the contractor is approximately 20 days behind schedule.”
4. A report (May 1, 1950) stated contractor was approximately 24 days behind schedule and added “operations seem to have improved to some extent during this period.”
5. Report of May 8, 1950 shows contractor to be approximately 28 days behind schedule. ■
6. Report of May 15, 1950 shows contractor to be approximately 31 days behind schedule.
7. Report of May 22, 1950 shows contractor to be approximately 32 days behind schedule.
8. Report of May 27, 1950 shows contractor to be approximately 15 days behind schedule.
9. Report of June 3, 1950 shows contractor to be approximately 20 days behind schedule.
10.Report of June 10, 1950 shows contractor to be approximately 23 days behind schedule.
A report (July 1,1950) states “Contractor’s original completion date is this day and contractor is 31 days behind schedule.”
Another report (July 8,1950) says “Contractor’s original completion date was June 29, 1950 and he is 33 days behind schedule.”
Report (July 15, 1950) states “Delayed 1 day (July 10, 1950) because of rain and hindered considerably 4 additional days. He is now 39 days behind schedule.”
There are also in the record Reports of the Resident Engineer with respect to progress on the job as follows:
1. Pex-centage complete as of March 31,1950, 22%.
2. Percentage complete as of April 30, 1950, 27%.
3. Percentage complete as of May 31, 1950, 59%.
4. Percentage complete as of June 3’0, 1950, 70%.
5. Percentage complete as of July 31, 1950, 92.5%.
With regard to finding 4 of the Contracting Officer, the fact is that operations were begun at the lower area of the river near the dam site, as required by the contract and specifications, not later than March 9, 1950, and proceeded upstream. With the exception of one bulldozer, which began operating in segment F on May 3,1950, all of the plaintiff’s bulldozers, plus a large number of men, were operating in that area from March 9,1950, until the closure was effected. *739 Some work was performed away from the Dam area before notice to proceed was received on March 1, 1950, and a crew of Mexican laborers also operated across the river in Bosque County for a period. No objection was voiced by or on behalf of the Contracting Officer during these operations. Reference thereto was first made as a part of the Contracting Officer’s findings.
Plaintiff did not comply with, or at all times follow specifically, all provisions of the specifications relating to performance of the clearing operation. Some complaints, concerning the maimer in which the plaintiff proceeded or failed to proceed in the performance of the job, appear to have been justified at the time involved. Corrective action was taken by plaintiff in most instances within a reasonable time and before closure of the dam was effected. On one occasion defendant employed the services of a bulldozer and cleared out some trees in an area previously called to the plaintiff’s attention, charging the cost to plaintiff. These trees had been lying on the ground about ten days after felling. This action also took place before the closing of the cofferdam. It is not possible, on the basis of the record, to find that any of the incidents or situations complained of had a direct causal relationship to the amount of damages suffered by plaintiff as a result of the closing of the dam 40 days prior to the expiration of the period allowed for the job under the clearing contract.
10. Although plaintiff did not keep all the records which should have been maintained, or which would normally be kept with respect to performance of a contract of this type, the records which were made available to defendant, and subsequently introduced in evidence support the claimed expenses which were incurred and paid for during the period from July 13,1950, to date of completion and acceptance of the work performed under the contract.
11. On the basis of the progress which had been made prior to May 20, 1950, and bearing in mind the crews and extra bulldozers available on that date to complete the work, it is found that, had closure of the dam been deferred until June 29, 1950, plaintiff could have substantially completed its work by July 13, 1950.
*740 12.The plaintiff’s costs incurred after July 13,1950, were the following:
Small tools and repairs- $4 481. 04
Gas and oil_ 4,036.65
Rentals- 1,721.56
Supplies_ 274.05
Bulldozer hire_ 35,662.14
Pay rolls_ 39,462.09
Social Security tax on pay rolls at 1.5%- 474.23
Contributions to Texas Employment Commission at 2.7%_ 1,065.47
Utilities_ 352.50
Miscellaneous- 588.11
Depreciation_ 3, 996. 90
Hauling_ 837. 72
Total_ $92,952.36
13.The defendant originally estimated the reasonable cost of the clearing job to be $222,884.00. Plaintiff’s bid was $79,600.00.
Seventeen other bids were submitted, arranged in order of the amount involved as follows:
1. $119,000.00
2. $119,181.00
3. $154,000.00
4. $237,500.00
5. $274,777.00
6. $279,850.00
7. $280,000.00
8. $295,000.00
9. $297,000.00
10. $336,420.00
11. $348,000.00
12. $372,047.17
13. $374,000.00
14. $381,149.00
15. $420,000.00
16. $488,000.00
17. $1,040,000.00
At the time of the submission of the bids the defendant, realizing that plaintiff had made a very low bid, offered to allow the bid to be withdrawn. One of the partners, Mr. Volentine, desired to accept such offer and withdraw the bid. The other partner, Mr. Littleton, was unwilling to do so and this error in judgment proved to be very costly to plaintiff.
14. It is not possible from the record to accurately determine how much of the $92,952.36 shown in finding 12 was attributable to the premature closure of the cofferdam, and how much of the work would have been required under the contract regardless of the early closure.
15. The plaintiff was granted an extension of 34 days beyond June 29,1950. The defendant’s estimate of work per *741 formed indicates that more than 90 percent of the job of clearing was completed at the expiration of the period allowed for the job. Although such estimate is not necessarily exact and was made primarily for purposes of periodic payments, it is reasonable to assume on the basis of the complete record, that the job could have been substantially completed within the time allowed under the contract, if the dam had not been closed on May 20 1950. It is also reasonable to conclude that during the period from May 27 to June 26, 1950, the progress, under otherwise normal conditions with the augmented equipment available, would have been approximately the same as that accomplished during the preceding report period.
16. The decision of the Claims and Appeals Board states:
The facts developed both at the hearing and in the record support the contracting officer’s findings that appellant did not prosecute the work in accordance with the specifications. Under the terms of the specifications appellant, “wherever practicable” was required to fell trees away from the river and to remove them from the stream beds for decking and burning. Burning or other approved methods of disposing of the clearing materials were required to closely follow the felling or clearing process “so that in case of high water or poor inundation” brush or other debris would not be washed into the river. Notwithstanding these requirements of the specifications, trees and debris were permitted to remain in the stream bed for burning with the result that trees were required to be winched or snaked out of the water because of the rises due to rains in the upper reaches of the Brazos River. As the.water lowered “progressively” trees which should have been removed earlier in the operations were revealed, which either had to be dragged out of the river or buried. It further appears that much of the debris which was required to be removed after the recession of the high waters proved to be from appellant’s own clearing operations. It appears to be established that a great deal of the damage suffered by appellant was due to a failure to conduct clearing operations as prescribed by the contract specifications.
Despite the precautionary language contained in paragraph TP-S of the specifications relative to the possibility of pool inundation, the issuance of Change Order No. 1 by the contracting officer recognizes that *742 the contractor was damaged by raising of the pool level due to making closure of Whitney Dam on 20 May 1950, some 40 days prior to the completion date of the clearing contract. This change order issued under Article 9, “Delays-Damages” and paragraph GC-7, “Possession Prior to Completion,” of the specifications, provides for an extension of time of 34 days for completion of the work because of delays in securing nghts-of-entry, floods and closure of the dam. The change order also provides for a lump sum increase in the contract price in the sum of $6,054.00 to cover additional work directed to be performed at low points in segments “A” and “C” of the reservoir area.
Appellant’s revised claim, however, has been asserted in the sum of $133,000.00 plus 15 percent for profit, in addition to remission of liquidated damages deducted for delay in completion of the contract in the sum of $7,650.00. In support of this contention, appellant states that on the basis of monthly estimate for the month of May 1950, they concluded that they had completed 31.6 percent of the work in the 30-day period ending 26 May 1950, and that they, therefore, would have been able to complete the work by 26 June 1950, within the specified contract time except for the action of the Government, completing the closure section of the dam.
It is from the period 29 June 1950, the specified contract completion date, until 29 November 1950, when the work was completed, that appellant claims additional cost of $133,000.00 plus 15 percent and payment of liquidated damages deducted from monthly estimates in the amount of $7,650.00. Actually the payment in May reflected work done in previous months.
At a conference held on 18 January 1951, in the office of the contracting officer, Fort Worth Engineer District, the affidavit of Earl Littleton, partner, referred, to above, was submitted, together with cost sheet compiled by appellant. An analysis of this cost sheet discloses that it is not properly set up. There is no explanation whatever for item paid for with “property” and all costs are not readily susceptible of audit. It is therefore considered of little or no value in determining what additional expenses may have been incurred in the performance of the clearing work during the period 29 June and 29 November 1950.
It may be pointed out that the abstract of bids, which is a part of the appeal record, discloses that appellant submitted a bid of $79,600.00 as compared with the Government estimate of $222,884.00 without profit. With *743 two exceptions, the remainder of the 15 bids substantially exceed the Government estimate for doing the work.
On review of the appeal record and the recorded testimony, including appellant’s supplemental brief, it is the view of the Board, and it so finds, that the clearing work was not performed in accordance with the contract specifications, as a result of which added costs were incurred, and that the allowance made by the contracting officer in Change Order No. 1 granting an extension of time of 34 days, and additional compensation of $6,-054.00 represents an equitable adjustment for increased work attributable to act of the Government in raising the level of the pool at Whitney Dam Reservoir.
The appeal is denied.
17. The plaintiff did not know, or have reason to know, either at the time the contract was awarded, or, at any time prior to May 19, 1950, that the cofferdam was to be closed before the expiration of the 120-day term of the contract. The plaintiff could reasonably assume that the area to be cleared would not be flooded by closure of the dam before the job of clearing was completed, if the completion was not unreasonably delayed. The object of the plaintiff’s contract was to get the area cleared before closure. Plaintiff suffered additional costs, greatly in excess of the amount found by the contracting officer, which are shown to have been the direct result of closing the dam May 20, 1950.
18. The decision of the contracting officer, confirmed on appeal, which allowed an extension of time of 34 days with the consequent remission of $1,700.00 in liquidated damages, and additional compensation of $6,054.00, does not represent an equitable adjustment for the additional work which resulted from an act of the defendant in permitting closure of the cofferdam 40 days before expiration of the period allowed by the contract, with less than 24 hours notice to plaintiff.
The record does not show that there was any substantial deviation from the specific wording of the specifications with respect to how and where the work would be accomplished, without the concurrence, approval or acquiescence of the defendant’s resident engineer or his assistants. These officials made no complaints in this regard while the work was in progress and the subject was first referred to in the decision of the Contracting Officer. It was for the safety of *744 tbe workmen that the crews were scattered over a large area rather than being concentrated near the dam as they were when the work was first begun in that area.
The findings of the Contracting Officer affirmed by the Claims and Appeals Board, as to the extra expense caused the plaintiff by the early closing of the cofferdam were not supported by substantial evidence.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Buie 38 (c).
In accordance with the opinion of the court and on a memorandum report of the commissioner as to the amount due thereunder, it was ordered on June 12, 1959, that judgment for the plaintiff be entered for $44,050.