PeR Curiam :
This case was referred pursuant to Eule 45 to W. Ney Evans, a trial commissioner of this court, with directions to make findings of fact and recommendations *3 for conclusions of law. The commissioner has done so in a report filed October 24, 1960. Briefs and exceptions to the commissioner’s findings were filed by both parties, and the case was submitted to the court on oral argument by counsel. Since, after full consideration of the record, the court is in agreement with the findings and recommendations of the trial commissioner as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Plaintiffs are therefore entitled to recover and judgment will be entered for plaintiffs in the sum of $85,796.01.
It is so ordered.
OPINION OP COMMISSIONER
In March 1949, the Alaska Eailroad issued invitations for bids on two contracts for the rehabilitation of its tracks. Plaintiffs, corporate joint venturers, submitted the successful bids and were awarded both contracts. The appropriations on which the Eailroad relied were delayed, and the work was postponed until 1950. The contracts were executed on February 7, 1950.
One contract (identified as No. 8567, and sometimes referred to as the embankment contract) called for the widening of the subsurface embankment upon which the track rested, together with some track raising, realignment, and renewal of ballast, in six specified work sections.
The other contract (identified as No. 8568, and sometimes referred to as the relay contract) called for replacing 70-pound rail with 115-pound rail in two work sections.
While work was done on both contracts in 1950, none (except for a minor segment not material here) was done during that season on the section in controversy, which was described in the embankment contract (No. 8567) as work section 6, extending south 12.9 miles from Anchorage to Potter.
Among the requirements on work section 6 in Contract 8567 were “the raising of the entire track and the elimination of numerous sags.”
This contract also gave the “location and description of borrow pits in relation to work sections,” including two which were specifically related to work section 6, both of *4 which, were said to contain gravel suitable for track raising as well as bank widening. One of these borrow pits was at milepost 106, adjacent to Turnagain siding, and is described in the findings as the Campbell pit. The other “pit” was a high embankment at milepost 116, at the northern end of the Anchorage Yard, and was known as the Anchorage Yard pit.
In August 1950, the Railroad decided that it would be advantageous to increase the emphasis upon rail replacement and track raising, and to use the funds available for Contract 8567 for that purpose. To this end the Railroad proposed and the contractor agreed to an arrangement for the termination of Contract 8567, thereby permitting the transfer of funds to Contract 8568, under which much of the track raising required by Contract 8567 (including the section in controversy) would be carried forward.
Extensive negotiations, oral and written, followed in ironing out the details of the new arrangement. The Railroad surveyed its needs and determined what work should be done where. Careful attention was given to the accounting details requisite to the termination of Contract 8567. Representatives of the contractor met twice with the contracting officer for extended discussions of the nature and locations of the revised assignments and the methods of accomplishing the work.
At the second of these conferences, in Portland, Oregon, in March 1951, discussions were held as to the source of ballast material to be used in the Potter to Anchorage work section. Among the contractor’s representatives there was some preference for the pit in the Anchorage Yard. The contracting officer, however, preferred Campbell pit, as a means of obviating the necessity of moving the work trains through the classification yard. The Anchorage pit was at the north end of the classification yard, 2 miles from the northern terminus of the work section. The Campbell pit was located approximately midway in the work section. Plaintiffs’ representatives therefore agreed to the use of the Campbell pit, and specified it on their progress chart, which was submitted to the contracting officer a few days after the conference.
*5 Immediately after the conference the parties executed the requisite contract documents, terminating Contract 8567 and amplifying Contract 8568.
The supplemental agreement extending and amplifying Contract 8568 provided (as additional work) for “approximately 103 miles of ballasting, raising, lining and dressing” of track (without further breakdown of work sections), listed “approximate quantities” of items for the 103 miles as a whole, specified units and unit prices, and extended the dollar amounts based on quantities and unit prices. The specifications of Contract 8567 were carried over into Contract 8568 for a limited purpose only, which did not include application to the track raising between Potter and Anchorage.
Under these circumstances the termination of Contract 8567 resulted in the elimination from the contract documents of the appellation of work section 6 and its milepost designations together with the specifications of Contract 8567 applicable thereto, including the designation of borrow pits “related” to the section.
The 103 miles of track raising included the portion which had been work section 6 under the terminated contract. This fact is established by agreement of the parties. Absent such agreement, support for the inclusion of the section in controversy could be found only in matter de hors the written contract, including the correspondence and the course of conduct of the parties.
Another provision of Contract 8568, as modified, moved the completion date forward to December 1, 1951.
Among the provisions and specifications of Contract 8568 (as modified) applicable to the track raising between Potter and Anchorage were: (1) the agreement of the Railroad to furnish work train service, including locomotives and ballast cars;[1] and (2) standards for the content (sizes of gravel) of ballast material. Also retained in the modified contract was a provision which in context was related to the two “approved ballast pit locations” described in the orig *6 inal Contract 8568 for relay work north of Anchorage (nearer Fairbanks) as follows:
* * * If the Contractor can find equally as suitable ballast deposits more convenient to his work locations, The Alaska Railroad will assist him in developing such ballast pits, providing the ballast meets with the approval and requirements of the Engineer. * * *
There is no evidence to suggest that the elimination of the descriptions of the Campbell and the Anchorage Yard pits, as sources of ballast “related” to the Potter to Anchorage work section, was discussed or agreed between the parties in the preparation and execution of the modified contract documents. On the contrary, the inferences are that the Railroad, in preparing the documents, centered attention upon the accounting between it and the contractor and upon specifying the work to be done; and that the contractor, having satisfied itself as to the accounting, and being content with the oral discussions of what work was to be done and how and in what sequence it was to be done, signed the contract documents without being specifically aware of the deletions or their possible effect from the contractor’s standpoint.
Work under the revised contractual arrangement was begun by the contractor in 1951 as soon as the weather permitted. Whereas the plan had been for starting the work around the middle of May, the continued presence of frost in the ground and other incidentals delayed the start of the work until June 1. These 2 weeks of delay were never made up. Whereas the contractor had planned to begin on the section from Potter to Anchorage on September 1, it was not ready to do so until September 15.
Defendant contends that, because of this delay in starting, and because of the arrival of freezing weather earlier than usual in the fall of 1951, the contractor could not have finished the Potter to Anchorage section during the 1951 work season in any event. The facts do not bear out the contention. If the contractor had not encountered the delay hereinafter described, it could have completed the work between Potter and Anchorage during the 1951 season, and would not have had a carryover to the 1952 season.
*7 Plaintiffs now sue for tbe additional costs incurred by them as a result of delay in 1951 which they attribute to the fault of the Eailroad.
In March 1951 the Alaska Eailroad transferred to the Alaska Housing Authority a tract of land lying within the Eailroad’s terminal reserve. This tract was situated on top of the mesa, the western boundary of which was the long, high embankment which comprised the Anchorage Yard pit. The Eailroad undertook to limit the use of the gravel pit so that the top of the slope would not encroach or advance beyond 60 feet of the Housing Authority’s tract.
During the summer of 1951, the Eailroad withdrew from the Campbell pit 42,928 cubic yards of ballast material for use in a section immediately south of Potter. This section was under contract to a contractor other than plaintiffs. In that contract the Eailroad had undertaken to load and haul ballast to the jobsite. The contract did not specify the source from which the ballast material would be taken.
The quantity so withdrawn exceeded the 40,498 cubic yards ultimately required for ballast in the Potter to Anchorage section.
In the process of removing the 42,928 cubic yards of gravel from the Campbell pit, sand lenses were found to be so extensive in the underlying strata as to render Campbell pit of doubtful utility as a source of additional ballast material.
Sometime in August 1951, plaintiffs entered into two additional contracts with the Eailroad: one for the grading and drainage of the Anchorage Yard; and one (on force account) for removing a scrap heap from the face of the gravel embankment in the Yard.
Toward the end of August the contractor’s superintendent informed the Eailroad’s project engineer that he proposed to commence work on the Potter to Anchorage section about September 15 and would bring down from the north 10 ballast cars to haul ballast out of Campbell pit. In reply he was told that the contractor would not be permitted to use the Campbell pit but would have to go to the Spencer pit for the Potter to Anchorage ballast.
The Spencer pit was at milepost 55, which was 45.8 miles from the southern terminus and 58.97 miles from the *8 northern terminus of the Potter to Anchorage section, representing an average haul of 52.4 miles as contrasted with average hauls of 3.3 miles and 7.6 miles from the Campbell pit and the Anchorage Yard pit, respectively.
It would not have been economically feasible to have begun the haul from Spencer with 10 ballast cars, which were all the contractor could spare on September 15 from the work then being completed north of Anchorage. The week or 10 days which elapsed after September 15 before the contractor could release additional cars in substantial numbers were crucial to its plans.
Correspondence between the contractor and the Eailroad ensued, the contractor demanding to be permitted to use the Anchorage Yard pit, if the Campbell pit no longer contained suitable material, and the Eailroad remaining adamant in its instructions to the contractor to go to Spencer for the material.
The reason given by the contracting officer for refusing the contractor the use of the Anchorage Yard pit was that “this pit is not available as the material which we originally contemplated using for ballast is now being used by your company for fill * * * in the Anchorage Yard Grading and Drainage Project.”
The findings show that suitable material was available in Anchorage Yard pit in quantities sufficient for both the grading and drainage project and the Potter to Anchorage ballast without encroachment upon the 60-foot limit imposed for the benefit of the housing tract and without impediment from the scrap removal job.
The contracting officer never questioned the suitability of the material in the Anchorage Yard pit. Ballast could have been taken from there as pit-run gravel, without screening. Mixing, if found necessary, could have been done with a bulldozer at the base of the embankment.
On September 18, 1951, the contractor advised the contracting officer that it would “expect to be reimbursed for any and all additional costs or expenses made necessary by this change in plans,” and proceeded to Spencer.
The pit at Spencer was at the terminal moraine of a glacier. Oversize rock was mixed with the gravel in such *9 quantities as to require screening with a grizzly. The drag-line (used instead of a shovel because of the grizzly) picked up loosened material at the base of the gravel-face, where quantities of water had accumulated. As a consequence the ballast material was quite wet.
Freezing weather began earlier than usual in the fall of 1951. As the work train service out of Spencer pit was operated, ballast was left in the cars overnight. As the freeze continued, loaded cars had to be taken to thawing sheds before they could be unloaded. Further effort to obtain ballast from Spencer pit was abandoned on October 14. Some 503 cars, containing 17,473 cubic yards of ballast, had been loaded and dispatched.
The contracting officer made an inspection of the work on October 25 and 26, and found the subgrade frozen to depths of 8 to 16 inches. He indicated to the contractor that work on frozen subgrade would not be accepted. Inasmuch, however, as the weather had then moderated somewhat, he withheld the issuance of a stop order “in the hope that we would * * * be able to complete * * * the work.” Four days later, on October 30, he ordered the contractor to suspend operations “until such time as the roadbed * * * is completely free of frost,” adding that the time of completion of the contract would be extended accordingly.
The contractor suspended operations immediately, until the summer of 1952, when the work was resumed and completed to the satisfaction of the contracting officer.
The carryover to 1952 would not have been necessary, and some of the expenses incurred by the contractor in the performance of the Potter to Anchorage work would not have been incurred, if the Railroad had left the Campbell pit undisturbed and had permitted the contractor to use it, or if the Railroad had permitted the contractor to take the ballast from the Anchorage Yard pit.
The question is whether or not the Railroad (defendant) is legally responsible for the consequences of its actions in depriving plantiffs of the use of the Campbell pit and in refusing them the use of the Anchorage Yard pit.
Barling v. United States, 126 Ct.Cl. 34 (1953), points up fault on the part of the Government in causing delay as a *10 requisite of liability for tlie consequences of such delay. Absent fault or negligence, there is no liability. United States v. Foley, 329 U.S. 64 (1946.) In Barling the court found that the Government had “exercised great diligence in an effort to secure steel for the plaintiff as needed, and * * * its inability to do so was not attributable to any fault or negligence on its part.”
The series of cases wherein the Government has been held liable for the consequences of delay caused by fault or negligence on its part include: George A. Fuller Co. v. United States, 108 Ct.Cl. 70 (1947), where the Government was tardy, without “an excusable reason,” in furnishing models for the Archives Building; Kehm Corporation v. United States, 119 Ct.Cl. 454 (1950), where the Navy was “far from diligent” in supplying tail assemblies for bombs the plaintiff was to manufacture; Chalender v. United States, 127 Ct.Cl. 557 (1954), where the Army Engineers were “negligent, not only in failing to use due diligence in expediting delivery of materials [plumbing fittings for a construction job] * * * but in their failure to place their purchase orders so as to permit timely delivery * * *”; Ozark Dam Constructors v. United States 130 Ct.Cl. 354 (1955), where again the Army Engineers showed “a complete lack of consideration for the interests of the plaintiffs” in their failure to make provision for timely delivery of cement; Peter Kiewit Sons' Co., et al. v. United States, 138 Ct.Cl. 668 (1957), where the Bureau of Reclamation “acted without proper and adequate consideration for the interests of the plaintiffs” in its failure to provide a penstock for the dam under construction; and Volentine and Littleton v. United States, 144 Ct. Cl. 723 (1957), 169 F. Supp. 263, where the Army Engineers were “completely inconsiderate of the interests of the plaintiff” in closing a cofferdam with less than 24 hours’ notice, thereby flooding land plaintiff was clearing.
In the instant case the evidence makes it abundantly clear that the Alaska Railroad “acted without proper and adequate consideration for the interests of the plaintiffs,” within the meaning of the cited cases, in stripping the Campbell pit of usable ballast material and then denying plaintiffs the use of the Anchorage Yard pit as a substitute.
*11 The Government, in its contracts with the claimants in the cited cases, had expressly undertaken to furnish Fuller with the models for the Archives Building; to supply the tail assemblies to Kelvm Corporation; and to provide the plumbing fixtures for Chalender, the cement for the Ozark Dam Constructors, and the penstock for Kiewit.
Liability, in these cases, was based upon a breach by the Government of its contract to furnish the models, or to supply the tail assemblies, or to provide the fittings, the cement, or the penstock.
The unusual twist in the instant case is that the governing contract documents (Contract 8568 as modified) contained no undertaking by the Railroad to furnish ballast, or even to make available either of the borrow pits now in controversy. All references to ballast, as “related” to the Potter to Anchorage work section, were eliminated by the termination of Contract 8567.
Plaintiffs contend in their briefs that a breach of contract resulted from the defendant’s failure to furnish adequate work train service with which to move the requisite ballast from Spencer pit to the jobsite. The facts indicate that defendant met its obligation to furnish work train service as fully as the extent and condition of the Eailroad’s equipment would allow.
Plaintiffs restate the contention in terms of a breach of contract resulting from defendant’s failure to coordinate the ballast pit location which it would approve with the work train service it was prepared to furnish. The weakness of this position lies in defendant’s obvious answer that, on the facts, plaintiffs had failed to coordinate their use of the available work train service with the location of the ballast pit which the Railroad did approve.
In Volentine and Littleton, supra, the Government had no contractual obligation to furnish materials or supplies. The contractor in that case undertook to clear an area of land which was ultimately to be flooded by the rise of water behind a dam. Defendant flooded some of the land before the plaintiff had cleared it. The court said that this “inconsiderate conduct was a breach of that term which every *12 contract contains, by fair implication, that one party to a contract will not impede performance by the other.”
While the action of the Railroad, in the instant case, in stripping the Campbell pit and refusing plaintiffs the use of the Anchorage Yard pit in its stead, was inconsiderate conduct, it does not follow that the action was such as to impede performance by the contractor within the meaning of Volentine and Littleton. When the Army Engineers in that case entered into the contract for clearing the land, there was an implied representation, if not a promise, that the land was and would remain, for the purposes of the contract, available for clearing without action by defendant to render it unavailable or to impede access to it. Such an obligation is implicit in “that term which every contract contains * * * that one party * * * will not impede performance by the other.”
In the Barling case, supra, where the court found “no evidence that the defendant was in any way at fault in failing to exert its best efforts to obtain the steel it had agreed to furnish,” the plaintiff countered that, although there may have been no breach by defendant of obligations imposed by the contract, defendant had warranted that it would furnish the steel, and that its failure to do so was a breach of warranty. For evidence of the warranty, plaintiff relied on statements made to him by representatives of defendant.[2]
In the instant case the contracting officer agreed with representatives of the plaintiffs at the Portland conference in March 1951, before the execution of the modified contract documents: (1) that the work section of Potter to Anchorage would be retained as part of the contract work, being one segment of the 103 miles of track raising which was to become additional work under Contract 8568; and (2) that the Campbell pit should be used as the source of ballast for the Potter to Anchorage work section.
When the contract documents were signed, they contained no specific reference to the Potter to Anchorage work section and no mention of the Campbell pit.
*13 It seems rather technical for defendant to contend that plaintiffs were bound by the contract to continue the Potter to Anchorage work section, but that the Railroad was relieved of its obligation with respect to the ballast pit. In the formal writings details were lacking as to either obligation.
It is my conclusion that the Railroad was under obligation to provide Campbell pit as the source of ballast for the Potter to Anchorage work. Whether that obligation was part of the contract, by implication and intendment although not written, as was plaintiffs’ obligation to perform the Potter to Anchorage work, or whether the obligation rested on the contracting officer’s warranty,[3] is not so material as to justify extended discussion.
It follows that defendant breached its obligation to plaintiffs when it stripped the Campbell pit of usable ballast material for delivery to another contractor, thereby depriving plaintiffs of the use of the pit.
Plaintiffs’ request for permission to use the Anchorage Yard pit, after the use of the Campbell pit was denied, was, in effect, an offer to substitute Anchorage Yard for Campbell in fulfillment of the Railroad’s obligation. The refusal of the Anchorage Yard pit, under the circumstances, confirmed the breach of the Railroad’s initial obligation.
The breach of obligation by the Railroad caused the delay in completion of the work of which plaintiffs complain, and the delay caused plaintiffs to incur costs of performance in excess of the costs that would have been incurred had there been no delay. Plaintiffs are entitled to recover their increased costs, which have been found to total $35,796.01.
FINDINGS OF FACT
1. The tracks of the Alaska Railroad[1] extend 470 miles from Seward to Fairbanks, passing through Anchorage at milepost 114. This controversy is primarily concerned with a stretch of 13 miles immediately south of Anchorage.
2. (a) In March 1949, the Alaska Railroad issued invitations for bids on two contracts for the rehabilitation of the *14 Railroad. Attached to the invitations, in each instance, were the specifications[2] (and drawings) together with forms for the contracts and bonds.
(b) One set of specifications was later incorporated into Contract No. I-Sarr-8567, which is sometimes hereinafter identified by number (No. 8567) and sometimes as the embankment contract.
(c) The other set of specifications was later incorporated into Contract No. I-3arr-8568, which is sometimes hereinafter identified by number (No. 8568) and sometimes as the relay contract.
*15 3. (a) Plaintiffs,[3] as corporate joint venturers, submitted the successful bids and were awarded both contracts.
(b) The Alaska Eailroad issued the invitations for bids in anticipation of starting the work during the 1949 season. When its appropriations were delayed, the schedule was revised, to start the work in 1950. The contracts were executed on February 7, 1950.
4. (a) The embankment contract (No. 8567) called for “rehabilitating all or part of 144.1 miles (more or less) of main-line track * * * between Potter * * * and Clear * * for a consideration of $4,900,412.65. Insofar as material here, the emphasis of this contract was upon track raising, an operation which required close integration of the following steps: physically lifting the track (rails and ties) to make room for additional ballast; replacing defective ties and correcting the spacing of others; realigning the rails; and packing clean, pervious ballast under, between, and at the ends of the ties. The purpose of track raising is to elevate and realign the track, to improve drainage, to eliminate sags and humps and thus to improve the grade.
(b) Six work sections were described in Contract 8567.[4] The work section involved in this controversy was described as follows:
* * * Work Section No. 6 — Potter to Anchorage, 12.9 Miles. The main work on this section entails the widening of existing embankments and a few cuts, the raising of the entire track and the elimination of numerous sags. As 115 pound rail has been recently laid on this entire section all ties will have to be respaced to standard requirements. Several line changes are required. Sixteen bridge bents have to be raised and two new bridge bulkheads (wood) installed. Bridge No. 112.8 over Chester Creek has to be raised four (4) feet. This is a steel span resting on treated timber abutments. (See special plan and construction requirements on same in “Structures”). Potter siding has to be extended northward.
5. The relay contract (No. 8568) called for “rail relaying; ballasting and raising of track; respacing of ties * * *; *16 and other incidental work” along 101 miles of main-line track (in two sections) for a consideration of $1,944,655.80. Insofar as material here, the emphasis of Contract 8568 was upon the substitution of 115-pound rail for 70-pound rail, an operation requiring substantially the same steps in the spread of ballast as were required in track raising.
6. (a) The embankment contract (No. 8567) provided[5] that the Railroad would furnish, free of charge, for the 1950 work season, 6 locomotives and 39 ballast cars. The relay contract (No. 8568) provided[6] that the Railroad would provide two locomotives, specifying that “ [N] o other Alaska Railroad equipment is now available for this contract.”
(b) Both parties to the two contracts were aware that the work train locomotives and ballast cars available on the Alaska Railroad were limited in number and poor in condition, and that plaintiffs would be dependent upon the work train service furnished by the Railroad for deliveries to the jobsites of ballast from the pits to be selected.
7. (a) Both contracts contained identical provisions[7] concerning the standards for ballast material, as follows:
Track Raising Material Glassification — All track raising material shall be clean gravel and conform to the American Railway Engineering Association for pit-run gravel, Grades A or B. Any deviation from these standards must be approved by the Engineer.
American Railway Engineering Association Standards for Pit Run Gravel

Sieve Sine {Square Openings) Amounts finer than each sime Per Gent Ijij weight

2% inches-97% to 100%
No. 4-20% to 65%
No. 200- 0% to 3%
(b) Under this specification, not over 3 percent of the material could be stones over 2y2 inches in diameter. In the use of pits where stones in excess of this size appeared in substantial quantity, the use of a grizzly was necessary, *17 to screen out the larger stones in the loading process. At the other extreme of the specification, not over 3 percent of the material could be fines in the nature of powder or dust. (A No. 200 sieve has 200 wires to the square inch.) From 20 to 65 percent of the material could be % inch or less in diameter. (A No. 4 sieve has four wires to the square inch.) Some 32 percent of the material, as a minimum, and 77 percent as a maximum, was expected to fall within the range of % inch to 214 inches in diameter.
(c) Both parties to the two contracts were aware of the previous practice of the Alaska Railroad in making allowances for reasonable tolerances in the foregoing requirements, in the interest of using pit-run gravel from various pits along the Railroad.
8. (a) The embankment contract (No. 8567) gave the “location and description of borrow pits in relation to work sections.” The description listed 14 borrow pits, of which 2 were “related” to work section 6 by the following statement:[8]
Work Section No. 6 — Potter to Anchorage — M.P. 100.9 Near Potter to M.P. 113.8 near Anchorage — 12.9 Miles — On this 12.9 mile section new 115 pound rail was laid in the work season of 1948. Banks and cuts have been previously widened in most places by Alaska Railroad forces. The main work in this section entails the elimination of sags by further bank widening and raising the tracks. * * *
Pit at M.P. 106.0 adjacent to Turnagain Siding: A limited amount of good gravel for both bank widening and track raising can be obtained from a new pit location adjacent to Turnagain Siding. As this pit site is located on private property arrangements and written agreements have been made by the Alaska Railroad with the property owners for the Contractor to purchase the gravel required at ten (10) cents per cubic yard. Considerable stripping with bulldozers has to be done to carefully remove the top soil which averages 12 inches deep over this area. A bank of clear gravel approximately fifteen (15) feet high, one hundred (100) feet wide and fifteen hundred (1500) feet long can be obtained here. Care will have to be exercised when removing the top soil as it is also agreed to replace the *18 top soil on the floor of the pit after the removal of the gravel bank. It will be necessary to lay at least 2,000 lineal feet of pit track to operate efficiently with work trains out of this pit. The proposed pit access spur would branch off Turnagain siding which holds sixty (60) cars.
Pit at Mile 116.0 North of Anchorage; Although this pit is located two miles north end of Work Section No. 6 suitable gravel for both bank widening, bank raising and track lifting is readily available for all the requirements on this entire proposed work section. The Alaska Railroad forces have stripped this pit and laid considerable trackage in same. Due to this pit being located at the north end of the Anchorage Terminal yards, considerable work train interference and delays can be expected in operating such trains both southward and northward through these yards.
(b)The relay contract (No. 8568) described two “approved ballast pit locations,” as follows:[9]
(c) Approved Ballast Pit Locations: On Work Section No. 1, Caswell to Curry (M.P. 201.76 to M.P. 247.86) there is only one known and developed ballast pit located at M.P. 228.2 that is deemed suitable by the Engineer for the final ballast lift required for this section. Sufficient ballast can be readily obtained from this pit with very little development work, as pit tracks, camp siding, water tank and other facilities are already installed there. Some additional stripping might be necessary. Deposits of unsuitable ballast material in this pit can be used for making the line change at Mile 212 and siding extension embankments at Caswell.
(d) On Work Section No. 2, Nenana to Fairbanks (M.P. 413.8 to M.P. 467.93) there are no known deposits of gravel suitable for such final ballast lifts. Such material will have to be obtained from deposits adjacent to Fairbanks Terminal Yards or from the Clear pit at M.P. 394.5. The Contractor must anticipate considerable difficulty and delays in obtaining such ballast at either of these locations on account of both these pits being now occupied by present bankwidening and grade raising contractor forces. Suitable gravel can be obtained though from the Chena Slough at Fairbanks, and from a new pit location at Clear without interfering with the present contractor’s loading activities at either *19 of these two locations. The Alaska Railroad will arrange the movement of trains so that the rail laying contractor can get his ballast trains through the present contractor’s work areas.
(c) The foregoing specifications of Contract 8568 were modified by the following provision:[10]
(e) If the 'Contractor can find equally as suitable ballast deposits more convenient to his work locations, The Alaska Railroad will assist him in developing such ballast pits, providing the ballast meets with the approval and requirements of the Engineer. The Alaska Railroad will provide the Contractor with rails, fittings and ties for such pit development work. The Contractor will lay and remove the pit or other tracks he may require at such new locations at his own expense.
(d) Ballast suitable for the track raising work here in controversy was available in either of the borrow pits described in Contract 8567. The distinction between “ballast pits” and “borrow pits” is not material.[11]
9. (a) Work proceeded on both contracts during the summer of 1950. This work did not include any track raising on work section 6 of the embankment contract.[12]
(b) Between the end of the work season of 1950 and the beginning of the 1951 work season, the contractual obligations of the parties were modified as hereinbelow outlined.
10. In June 1950, the Alaska Railroad opened negotiations with the Alaska Housing Authority looking toward the transfer by the Railroad to the Authority of a tract of land in the Railroad’s terminal reserve for use in a housing development by the Authority. The land in question was on top of and somewhat removed from the large embankment near the railroad tracks which represented the borrow “pit at mile 116 north of Anchorage” hereinabove described in finding 8(a). The negotiations culminated in the transfer of the land in March 1951 from the Railroad to the Authority. *20 The transfer did not impede the use of the borrow pit by the Railroad.
11. (a) On August 12, 1950, the contracting officer[13] wrote to plaintiffs’ corporate officer:[14]
The 70-lb. rail presently in the main line of The Alaska Railroad has deteriorated at such a rapid rate and to such an extent that its continuance in service is neither safe nor practicable. This condition has also had an adverse effect on the large number of untreated ties presently in use, and has resulted in heavy costs to the Railroad in renewing ties whose life has been shortened due to the mechanical wear of the rail on the ties and to the necessity of replacing ties which would be otherwise serviceable with a sufficient number of new ties to hold the rail to gage without tie plates.
The life of both the rail and the ties has been shortened by a serious lack of ballast, and these three factors have necessitated the placing of many slow orders which have resulted in a decrease in train speeds. This decrease in train speeds has also caused an increase in operating costs and the loss of revenue to the Railroad due to the diversion of perishables and other high class merchandise to other forms of transportation. The Railroad is also under a heavy burden of expense due to the necessity of considerable surfacing and resurfacing track where otherwise it would not be required to do so.
All these factors contribute to the hazard of accident with the consequent liability of loss of life and damage to merchandise which can be replaced only at high cost and after the passage of a very considerable period of time.
The Rehabilitation Program of The Alaska Railroad was originally predicated upon the orderly receipt of funds, and its inability to secure the authorization necessary to allow it to proceed with its construction program in the 1949 work season has resulted in these conditions arising which otherwise would have been remedied by this time. The Railroad’s inability to secure these funds as scheduled has seriously affected the orderly sequence of the program, and to reestablish the program in the manner originally contemplated' would *21 now result in excessive expenditures in interim maintenance costs pending the replacement of rail and ties and the ballasting of the track in the sequence as originally contemplated.
In view of the foregoing, it is the desire of the management to modify or extend Contract * * * 8561 and * * * 8568 as follows:
1. That Contract * * * 8567 be concluded as soon as possible under terms to be mutually agreed upon between your companies and the Eailroad.
2. That Contract * * * 8568 be extended to include the placement of rail; renewing and spacing of ties, plus placement of additional ties; the surfacing of track with an average 8" lift of clean ballast gravel; the dressing, lining and superelevation of track to standards to be mutually agreed upon; and the raising of such bridges, and such other work as may be necessary to accomplish these ends and other allied results desired by the management in accordance with the attached sheet entitled “Proposed Eail Eelay with Suspension of Bank Widening Program” within the limits of funds presently obligated to your companies under Contract * * * 8567 and * * * 8568 * *
3. The Alaska Eailroad will furnish and operate free of charge to the contractor sufficient work train service for this work to the extent of its ability. * * *
4. The Alaska Eailroad will furnish free of charge and to the extent of its ability sufficient camp cars and ballast cars for this work. * * *
*****
8. That the time of completion of Contract * * * 8568 be extended to December 1, 1951, and all other provisions and conditions of this contract, except as wherein added, extended or modified, will remain in effect.
*****
This is in confirmation of verbal agreements previously made by the management and the Engineering Department of The Alaska Eailroad with you, and is in reply to your letter of August 4 confirming these previous conversations.
*****
(b) The sheet attached to the foregoing letter as “Proposed Eail Eelay with Suspension of Bank Widening Program” listed as one of the locations “Potter to Anchorage (100.8 to 113.97) 13.17 miles” wherein the work to be done *22 would include “raise, line and dress” 68,510 track feet; “respace ties” over the same distance; “replace ties” to the extent of 700 per mile; and place 32,900 cubic yards of ballast (at the rate of 2,500 cubic yards per mile). The consideration for this work, computed at unit prices of Contract 8567 totaled $179,772.[15]
(c) On August 28, 1950, plaintiffs’ corporate officer replied to the contracting officer:
Receipt is acknowledged of your letter of August 12, 1950, on the subject of modifications to Contracts * * * 8567 and * * * 8568.
Our verbal agreement and acceptance of your offer of August 12th is hereby confirmed in writing.
We have ceased work on Contract * * * 8567 * * *. * * *
We are making every effort to expedite work under Contract * * * 8568 * * *.
We presume that formal contract documents covering these changes are being prepared.
12. (a) On September 1, 1950, the contracting officer acknowledged receipt of the contractor’s letter of acceptance and advised that “ [F] ormal contract documents covering these changes will be prepared.”
(b) On September 5, 1950, plaintiffs’ corporate officer again wrote to the contracting officer:
$ $ $ :fc ‡
Due to the change in this program it is necessary that we utilize our equipment and personnel to the best advantage for the remainder of the year. We believe that it is to the best interest of the railroad and these companies to properly prepare the sites which are to be used to procure gravel ballast for work to be performed under Contract * * * 8568. We believe that we should strip the unsuitable material from these locations and prepare the grade for the pit trackage this year. This procedure should permit opening these pits earlier and permit their operation with a minimum delay in the spring.
Will you, therefore, kindly advise us what sites are to be used for the production of this material. Your prompt action in this regard will be appreciated.
*23 (c) No formal reply was made to the foregoing letter. The contractor’s corporate officer, however, on the same day he wrote the letter, took the matter up orally with the Railroad’s Assistant Chief Engineer. The contractor’s representative understood that he had from the Assistant Chief Engineer specific commitments concerning the use of five ballast pits north of Anchorage, and gave directions to his superintendent for preliminary work on four of them during the remainder of the 1950 season. With respect to the work south of Anchorage (which included four sections according to the Railroad’s tentative plans) ,[16] the contractor’s representative recorded his belief that—
* * * it is the intention of the railroad company to use the newly developed pit at Turnagain and the pit at Spencer. Neither of these pits require much work and I do not believe that we should do any work on either of these pits at this time.
(d) The contractor’s representative gave a copy of his staff memorandum to the Assistant Chief Engineer who forwarded it to the Chief Engineer with the comment:
* * * letter * * * needs some modification and explanation, as probable changes may be required due to the likely encountering of unsuitable ballast material at any of the * * * locations mentioned * * *.
* * * The information as stated * * * can be used as a tentative program on our next year’s work.
(e) The situation with respect to the sources of ballast material was not further clarified until March 1951.
13. (a) On January 15, 1951, the Engineering Department of the Railroad prepared a statement showing the “status of rehabilitation program as of January 1, 1951.” The section between Potter and Anchorage was listed in two entries, one showing that 1.8 miles of main track had been relaid with 115-pound rail and was “now in the process of having an 8" running raise applied, lined and dressed with *24 ties to be renewed and respaced,” while the remainder, 11.37 miles, represented “mileage of track * * * which the Engineering Department suggests be completed to present standards with funds available from the present bank widening and relay contracts.”
(b) On January 29, 1951, the contracting officer forwarded to plaintiffs “* * * three prints showing total work performed and estimate of work required in the 1951 work season to complete the contracts as they now exist.” The letter further advised that “* * * from monies available, it is anticipated that the following sections can be ballasted, raised, lined and dressed, ties respaced, replaced and added, and bridges raised: Potter (M.P. 100.80) to Anchorage (M.P. 113.97) 13.17 * * *” (miles). The contracting officer added:
* * * yye are very anxious to prepare the necessary supplemental agreements to Contracts * * * 8567 and 8568, and this will be done as soon as we have received your confirmation of the work performed during 1950, the work to be performed in 1951, and the proposed additions or changes as contained in this letter. * * *
(c) On February 10 (Saturday), 12, and 13, 1951, representatives of the Railroad (including the contracting officer and the Assistant Chief Engineer) and representatives of the contractor (including plaintiffs’ corporate officer and their project manager) met in the office of the contracting officer in Anchorage for an extended discussion of methods whereby Contract 8567 would be terminated and Contract 8568 extended. By a letter dated February 14, 1951, addressed to plaintiffs’ corporate officer, the contracting officer summarized the results of these conferences.
Reference was made to five items of previous correspondence, including the letters mentioned above in findings 11(a), 11(c), and 12(a). With respect to these letters, the contracting officer’s summary of the meeting said: “* * * we agreed to effect these changes [in Contracts 8567 and 8568] in the following manner and which supersede those portions of the letters mentioned above where they are in conflict.” The contracting officer’s letter continued:
*25 * * * Contract * * * 8567 will be terminated immediately. Work in progress under Contract * * * 8567 and which is yet incomplete is to be completed under Contract * * * 8568, as amended, in accordance with these terms and conditions. * * * * * * It is expected that sufficient funds will be available from Contract * * * 8567 to increase Contract * * * 8568 sufficiently to permit your companies to relay approximately * * * 132 track miles of 70-lb. rail with 115-lb. rail * * *; and to permit the placement of ballast, the renewing, spacing and placement of additional ties * * * on * * * 104 miles of track. These quantities are approximate only and are subject to change at the discretion of the Railroad.
The contracting officer’s letter contained no specific reference to what had been work section 6 in Contract 8567.[17]
(d) With respect to specifications, the contracting officer’s letter of February 14,1951, said that it had been agreed (1) to carry forward into Contract 8568 the specifications of Contract 8567 “for grading and the placement of culverts” insofar as those specifications applied to two previously listed items of work, and (2) to retain all specifications of Contract 8568 “as presently written” except for six specified changes. The material portions of these changes are noted below in finding 16 (b).
(e) It does not appear from the evidence that the contractor either accepted or excepted to the contracting officer’s summary of the February (1951) conference.
14. (a) On March 16, 1951, the contracting officer forwarded to plaintiffs copies of two proposed supplemental agreements: Supplemental Agreement No. 3 to Contract 8567 and Supplemental Agreement No. 4 to Contract 8568.
(b) On March 18 and 19, 1951, a further conference was held in Portland, Oregon, with the contracting officer and plaintiffs’ corporate officer, superintendent, project manager, and other representatives in attendance. The purpose of the meeting was to discuss and agree upon the work to be done and the methods of doing it, including the requirements of personnel and equipment, timing, and other incidents of conducting the work.
*26 (c) Among the subjects discussed was the selection of ballast pits for the various segments of the work. With respect to the work section between Saulich and Fairbanks, plaintiffs preferred the use of the Chena Slough pit, as being closer to the work, but the contracting officer insisted upon use of the pit at Clear as supplying better material, and agreement was reached on the use of the Clear pit. With respect to the work section in controversy, Potter to Anchorage, plaintiffs’ representatives were divided as to preferences for the Campbell (Turnagain) pit or the pit in the Anchorage Yards. The contracting officer was averse to the use of the Anchorage Yard pit, wherefore use of the Campbell pit was agreed upon.
15. (a) Following the Portland conference, on March 21, 1951, Supplemental Agreement No. 3 to Contract 8567 was executed by the parties.[18] Insofar as material here, the substance of Supplemental Agreement No. 3 to Contract 8567 is contained in the concluding sentence, that the contract (No. 8567) is “terminated as of this date.”
(b) The termination of Contract 8567 brought to an end all of its obligations, terms and conditions, including (1) the standard provisions set forth in footnote 2, finding 2(a); (2) the contractual undertaking for rehabilitation of the Railroad, summarized in finding 4(a); (3) the specification of work section 6, set forth in finding 4(b) ; (4) the Railroad’s obligation to furnish work train service, as described in finding 6(a); (5) the standard for ballast material as applied to work under Contract 8567, as quoted in finding 7(a) ; and (6) the location and description of borrow pits, as described in finding 8 (a).
16. (a) Supplemental Agreement No. 4 to Contract 8568 was signed on the same day (March 21, 1951) as the agreement terminating Contract 8567. Following are pertinent excerpts from this Supplemental Agreement:
ijí :j« Hí ❖ Hí
wheeeas, due to changed conditions * * *, it is deemed in the best interest of the Government that Contract * * * 8567 be terminated * * * and Contract *27 * * * 8568 be extended to permit the completion of the rail relay work between Portage and Healy (approximately 131 miles) and to permit ballasting, raising, lining and dressing, tie replacement, and additional ties on approximately 103 miles between Portage and Clear, * * *
$ $ ‡ $ H*
wheREas, due to the necessity of completing a line change at M.P. 308.5, and completing the installation of culverts between Wasilla and Willow, it is deemed in the best interest of the Government that the specifications for Contract * * * 8568 be revised and the specifications for Contract * * * 8567 be made a part of this Contract to cover the completion of this work, as more fully set forth under “Changes in Specifications” attached hereto.
Now, therefore, in consideration of the agreement by the Contractor to terminate Contract * * * 8567 and to perform the additional work set forth herein at the same unit prices prevailing in this Contract * * * 8568, it is mutually agreed as follows:
‡ $ $ $ $
II. That the following work be performed in addition to the work provided by the original Contract * * * to include the relay of approximately 131 miles of 115-lb. rail and approximately 103 miles of ballasting, raising, lining and dressing:

% ‡ ^ ❖ ❖
VII. The amount of the Contract shall be increased by a net amount of $2,610,393.31 to a total of $6,010,230.38.
*28 Except for changes as set forth herein, all other provisions of Contract * * * 8568 * * * shall remain in full force and effect.
# * * # *
(b) Supplemental Agreement No. 3 to Contract 8568, dated September 2, 1950, had contained the following provision, which continued in force:
* * * The time of completion of this Contract shall be * * * December 1, 1951.
(c) Attached to Supplemental Agreement No. 4 to Contract 8568 were (1) a justification for the work being added to the contract, reflecting excerpts from the letter quoted in finding 11(a), and (2) a statement showing changes in specifications. Following are pertinent excerpts from the latter statement:
A. Specifications * * * which cover the construction on Contract * * * 8567, are made a part of this Supplemental Agreement and are attached hereto. These Specifications shall govern the work covering excavation, unclassified and the placement of culverts, as contained in Section III of this Supplemental Agreement.
B. Specifications * * * covering work on Contract * * * 8568, shall remain unchanged, except that:
(1) The first sentence of Paragraph 2-24 (a) is revised to read: “As not more than an average of 8" of lift is desired throughout all sections of work, and ties have to be respaced, it will be the Contractor’s prerogative to make as many lifts as he deems necessary providing that when using jacks, they must be placed close enough together to prevent undue bending of rail or strain on the joints.”
(2) Paragraph 2-24 (c) is revised to permit the Contractor to line tangent track by eye instead of using a rail lining instrument. Many curves will require extensive lining to conform to present standards on The Alaska Kailroad, and this lining will be done at no added cost.
(3) Paragraph 2-24 now requires the Contractor to raise tracks to grade stakes. This requirement is now modified to permit the Contractor to make spot board raises, or to raise to grade stakes, at the direction of the Engineer, with the understanding that the average overall raise will not exceed 8'C
*29 (5) The contract requirement as contained in Paragraph 2-24 (d) is modified as follows: “The track will be dressed to conform to available roadbed width with sufficient ballast at end of ties to prevent lateral movement of track. Centers must be filled to top of ties and slope outward to permit drainage under both rails. The use of machines to accomplish this type of dressing is permitted.
«i» «i*
E. In consideration of the changed conditions set forth under Items B(l) * * * The Alaska Railroad:
(1) Will furnish and operate free of charge to the Contractor sufficient work train service for this work to the extent of its ability. The Contracting Officer’s decision on the nature and extent of this service shall be final.
(2) Will make no charge for work train service, conductor pilot service, rental of locomotives, dead-head time, excessive time for work train crews over eleven (11) hours, penalty payments, extra calls for work trains, rest days for work trains, and copying orders.
(3) Will furnish free of charge and to the extent of its ability sufficient camp cars and ballast cars for this work. The Contracting Officer’s decision of the sufficiency of this equipment will be final.
(4) Will make no charge for rolling stock, including outfit cars and equipment, such as ballast, hopper, freight, box, refrigerator, and gondola cars, furnished under this Contract.
(5) Will furnish free of charge, but will not operate, two (2) Jordon Spreaders.
(6) Agrees to make no charge for train delays.
❖ # % H* %
17. (a) The appellation of work section 6 and its milepost designations as described in Contract 8567 were dropped upon the termination of that contract.
(b) The carryover of specifications from Contract 8567 was expressly limited to “work covering excavation, unclassified and the placement of culverts * * neither of which concerned the work between Potter and Anchorage insofar as that work is in controversy here.
(c) The work to “be performed in addition to the work provided by the original Contract * * as described in Part II of Supplemental Agreement No. 4 to Contract 8568, included the work of “ballasting, lining, and dressing” the *30 section from Potter to Anchorage which had formerly been in work section 6 of Contract 8567.[19]
(d) The same Part II of the Supplemental Agreement set forth the unit prices applicable to the work that was additional to that required by the original contract.
(e) Specifications for all such additional work were the specifications of Contract 8568 as amended. These included (1) the standard provisions set forth in footnote 2, finding 2(a) ; (2) the contractual undertaking for rehabilitation of the Railroad, summarized in finding 4(a), as amended by Supplemental Agreement No. 4 (see finding 16(a) for summary) ; (3) the new undertaking of the Railroad to furnish work tram service, as set forth in finding 16(c); (4) the standards for ballast material set forth in finding 7(a); (5) the description of two “approved ballast pit locations,” as set forth in finding 8(b), neither of which was “related” to the work between Potter and Anchorage; and (6) the modification of the “approved ballast pit locations” set forth in finding 8(c).
(f) The written contract (Contract 8568 as amended) contained no reference (1) to the borrow pits that had been designated in Contract 8567; (2) to the correspondence which had passed between the parties in relation to the revision of their contractual obligations; or (3) to the discussions and agreement at the Portland conference relating to the use of ballast pits in general and the Campbell (Turn-again) pit in particular.[20]
18. (a) On March SO, 1951, plaintiffs’ corporate officer forwarded to the contracting officer the contractor’s proposed progress chart “for rehabilitation work on your rail *31 road during the 1951 season.” The contractor’s forwarding letter said:
* * * This progress schedule conforms very closely to the schedule worked out in Portland * * *. The sequence of work is shown. The rate of delivery of material can be assumed to be in direct proportion to the time required to distribute same. The schedule is based on a * * * 7 day week. * * *
* * * Commencing late in May, we will need * * * ballast cars * * *. This number of cars will not decrease throughout the year, although in September, most of the cars will be assigned between Potter and Anchorage * * *. * * *
(b) The proposed progress schedule was in the form of a bar chart, utilizing dates extending from April 9 through September 28. Three of the bars related to the section between Potter and Anchorage. The first track raise in that section was to be made September 1-13; the final raise, September 13-28. The last entry on the chart showed the assignment of Camp #4 to Campbell pit for the period September 1-13, in relation to the Potter to Anchorage section.[21]
(c) No objection to the proposed progress chart was made by the contracting officer. Plaintiffs went forward with arrangements to perform the work in the sequences shown on the chart.
19. (a) Plaintiffs used most of the month of April and the first half of May in make-ready, and were preparing to begin actual operations near Fairbanks shortly after the middle of May. Frost was not yet out of the ground in the Fairbanks area, and the start of operations had to be postponed to June 1. When work was begun, further minor delays were encountered as a result of difficulties with the Eailroad’s work train equipment.
(b) During the summer, while plaintiffs’ forces were engaged on contract work north of Anchorage, the Eailroad assigned and plaintiffs accepted various extras, some of them to be performed at unit prices specified in the contract and some of them on a force account basis. Among these extras were two jobs in the Anchorage Yard: (1) a contract for *32 grading and draining the Anchorage Yard; and (2) a force account job for removing a scrap heap from one end of the Anchorage Yard pit.
(c) As the summer drew to an end, plaintiffs were approximately 2 weeks behind their schedule. They were not ready to begin work on the Potter to Anchorage section before September 15, whereas they had scheduled it to start on September 1.
(d) The work on the Potter to Anchorage section, as then specified, included the raising of the track from milepost 100.80 to milepost 113.97, a distance of 13.17 miles.
20. (a) On August 23,1951, the Railroad’s Assistant General Manager advised its Acting Chief Engineer by memorandum:
In accordance with the General Manager’s desire, this will confirm former verbal instructions to the effect that under no circumstances must gravel be taken from the pit located at the north end of the [Anchorage] Yard to the extent that it will cause the top of the slope to encroach or advance beyond * * * 60 feet of the boundary of Lewis and Luria leases.
(b) The Anchorage Yard pit (a high embankment) was of such dimensions[22] that the requirements of the Potter to Anchorage section could have been taken from it without danger of encroaching upon the 60-foot limit.
(c) As of tlfis time (August 23, 1951), plaintiffs were engaged in the work of grading and drainage of the Anchorage Yard and in removing the scrap from the face of the pit. Neither of these operations would have precluded the use of the Anchorage Yard pit for ballast in the Potter to Anchorage section.
21. (a) In late August 1951, plaintiffs’ superintendent informed the Railroad’s project engineer that he proposed to commence operations in the Potter to Anchorage section about September 15 and would bring down from the north 10 ballast cars to haul ballast out of Campbell pit. The project engineer informed the superintendent that he would not be permitted to use Campbell pit but would have to go to Spencer pit for the Potter to Anchorage ballast.
*33 (b) On August 29,1951, plaintiffs’ project manager wrote to tbe contracting officer:
* * * we * * * expect to start operations * * * between Anchorage Yard and Potter on or about September 15, and * * * to load the ballast * * * from the pit * * * at the north end of the Anchorage Yard. * * *
(c) On September 7, 1951, the contracting officer replied:
* * * I regret to advise you that this pit [Anchorage Yard] is not available as the material which we originally contemplated using for ballast is now being used by your company for fill * * * in the Anchorage Yard Grading and Drainage Project.
You will recall that when this specification was * * * written, it was thought that we would be able to proceed with this work immediately. Due to circumstances outside our control * * *, the work was delayed for one year, and in the meantime other requirements now make it impossible for you to use this pit. It will be necessary for your company to set up operations at Spencer * * * to secure the gravel required between Potter and Anchorage.
(d) On September 18, 1951, plaintiffs’ project manager again wrote to the contracting officer :
* * * you have instructed us to * * * procure all ballast which we use on the Potter to Anchorage section from the existing pit at Spencer.
* * * this pit at MP 116.0 is named as the available source of acceptable material for work section No. 6 (Potter to Anchorage) * * * in * * * the governing specifications.
We are, of course, obeying your instructions but wish it clearly understood that we shall expect to be reimbursed for any and all additional costs or expenses made necessary by this change in plans, including * * * any additional lost time, overhead or per diem penalties which may be incurred or exacted by reason of this change in program.
»j« ‡ ^
(e) On September 26,1951, the contracting officer replied:
* * * we differ very sharply on your interpretation of the specifications and supplementary agreements now governing our ballasting," lining and dressing requirements on that section of line between Potter and Anchorage,
*34 You have probably overlooked or forgotten, that only certain parts of the bank widening and grade raising contract specifications * * * 8567 are now in effect on the rail relay contract * * * 8568, and that Supplemental Agreement No. 4 pertaining to same designates these inclusions from contract * * * 8567 as follows: “These Specifications shall govern the work covering excavation, unclassified and the placement of culverts, as contained in Section III of this Supplemental Agreement.”
You will note that the specifications of contract * * * 8568 (rail relay) designating Approved Ballast Pit Locations, * * * include only the ballast pit sites at Mile 223.2, Clear and Fairbanks as being the known sources of suitable final ballast material, and though the rail laying and subsidiary ballasting was extended in Supplemental Agreement No. 4 over some of the work sections of the bank widening and grade raising contract, the approved borrow pit locations designated for such work in terminated contract * * * 8567 are not now in effect and the specifications you call to our attention in the second paragraph of your letter apply only to this terminated contract.
As it is the Eailroad’s obligation to haul the ballast at no expense to the contractor (the contractor loads and dumps only), it is our opinion that as we require a more suitable aggregate than can be obtained from the local borrow pits for the light raises required between Potter and Anchorage, it is exclusively within the Eailroad’s prerogative to make such extra, haul. We also maintain that it is also the contractor’s obligation under the terms of contract * * * 8568 and its supplemental agreements to load and dump such ballast at no additional expense to the Eailroad from Eailroad-selected pit locations.
It must also be noted that the location (Spencer Pit) where we require this ballast loading to be done is at a well-developed pit. A long loading track requiring but slight repair and maintenance work will permit your shovels or draglines to load all the gravel required without your forces having to move the loading track. * * * The small amount of work required to commence loading operations at Spencer location in comparison to the large amount of work that was required by your forces ■under the terminated bank widening contract at the Turnagain Pit * * * which * * * would require you to develop a new pit site there. Subsidiary to the laying of pit tracks and turnouts would be the careful removal and replacing of the top soil, plus the payment *35 by your company of ten cents (100) per cubic yard for all aggregate removed from this privately owned area.
* * * we see no justification in the claims outlined in your letter of September 18,1951, and * * * expect you to comply with the instructions outlined in my letter to you of September 7, 1951 at no additional expense to the Railroad.
22. (a) The Campbell (Turnagain) pit was located at milepost 106, approximately midway between Potter and Anchorage. The haul from this pit, on the work of the Potter to Anchorage section, would have been 5.2 miles from the pit to the southern terminus and 7.97 miles to the northern terminus, indicating an average haul of 3.3 miles.
(b) At the beginning of the 1951 work season, this pit contained ample ballast material of acceptable quality to supply the needs of the work on the Potter to Anchorage section.[23]
(c) During the summer of 1951, the Alaska Railroad excavated 42,928 cubic yards of ballast material from Campbell pit for use on another project.[24] Extensive sand lenses were uncovered in the process. Completion of the Railroad’s excavation so depleted the pit of acceptable ballast as to make it unsuitable for use in the Potter to Anchorage work.
(d) If the Campbell pit had been available to plaintiffs, in the condition in which it stood at the beginning of the summer of 1951, plaintiffs would have been able to obtain ballast from pit-run gravel, without screening. Some mixing might have been required, by bulldozer. They would have had to install some track in the pit, remove and replace topsoil, and would have had to pay $4,049.80 (10 cents per cubic yard) for the ballast. The pit was reasonably well drained, wherefore the moisture content of the pit-run ballast was fairly low.
*36 23. (a) Tli© Anchorage Yard pit was located at milepost 116, just 2 miles from the northern terminus and 15.2 miles from the southern terminus of the Potter to Anchorage section, indicating an average haul of 7.6 miles.
(b) As of September 1, 1951, this pit contained ample ballast material of acceptable quality to supply the needs of the work on the Potter to Anchorage section. Ballast could have been obtained from pit-run gravel without screening. Some mixing by bulldozer might have been required. The pit was well drained, wherefore, the moisture content of the pit-run gravel was low. Loading tracks were already in place. The pit was owned by the Eailroad, and no charge would have attached for use of the ballast by plaintiffs.
(c) At the Portland conference in March 1951, the contracting officer had objected to the use of the Anchorage Yard pit for the Potter to Anchorage work because of complications to be anticipated from normal use of the terminal as a classification yard. He maintained this position in August and September, with added objections based on (1) the danger of encroaching upon the 60-foot limit of the Housing Authority[25] and (2) the other work in which plaintiffs were engaged in the Yard.[26]
24. (a) The Spencer pit was located at milepost 55, being 45.8 miles from the southern terminus and 58.97 miles from the northern terminus of the Potter to Anchorage section, indicating an average haul of 52.4 miles. As of September 1, 1951, this pit contained ample ballast material of acceptable quality to supply the needs of the Potter to Anchorage work.
(b) The pit was located at the terminal moraine of a glacier, wherefore the moisture content of the ballast material was high. Moreover, plaintiffs used a dragline to excavate and load the ballast,[27] thereby pulling the materia] *37 down the bank and into accumulated pools of water before scooping the material for loading. As loaded, the material was quite wet. The material could not be used as pit-run gravel. The presence of many large stones required screening with a grizzly.
25. (a) It was not economically feasible to begin the haul from Spencer pit with the 10 ballast cars plaintiffs were prepared to release from other work on September 15. Loading was therefore delayed until September 29, when enough cars were available. Meanwhile, plaintiffs made preparations to dispatch the work as rapidly as possible once the start could be made. A loading crew was installed at Spencer pit, and track gangs were assigned to the Potter to Anchorage section.
(b) Three locomotives were made available by the Eail-road, one being assigned to move the ballast material from Spencer pit to Portage, one to haul from Portage to the jobsite, and one to take over at the jobsite for dumping. Between September 29, when the first cars were loaded, and October 14, when operations at Spencer pit were suspended, 500 cars of ballast aggregating 17,365 cubic yards were dispatched and placed. Three additional cars had been dispatched and were later used, for a total of 17,473 cubic yards.[28]
(c) Freezing weather came on somewhat earlier than usual in 1951, and plaintiffs began to encounter difficulties because of the freezing of the ballast materials in the cars and after dumping. Frozen cars had to be taken to thawing sheds overnight. The freezing of ballast after it was dumped complicated the work of tamping. Plaintiffs nevertheless persevered with the work.
(d) On October 25 and 26, 1951, the contracting officer inspected the work on the Potter to Anchorage section. On October 30, he wrote to plaintiffs’ project manager:
On Thursday, October 25, and Friday, October 26, I inspected the work being done by your forces north of M.P. 105.5 near Turnagain, and roadbed conditions *38 in the territory between M.P. 105.5 and M.P. 113.8 just soutli of Anchorage.
I found that the subgrade was frozen to a minimum depth of 8 in. below bottom of tie, and in some cases it was frozen to a depth of 16 in. below bottom of tie. Your crews had distributed gravel and had attempted to surface and line track between M.P. 105.5 and M.P. 107.5. The gravel on which the track was raised contained many frozen masses which did not compact properly, and which will not settle uniformly when the weather moderates. The result of this work to date is not acceptable, and further work done of this nature will not be accepted until climatic conditions permit proper compaction of gravel.
*****
Continuance of your operations in distributing gravel on frozen subgrade, or attempting to raise track with frozen gravel, or to line track in frozen ballast or any combination of these operations may result in damage to the structure of the track involved.
Therefore, in accordance with Paragraph 1-21 of the ■Specifications, you are hereby ordered to suspend operations until such time as the roadbed in the area in which you are working or intend to work is completely free of frost.
The time of completion of the contract shall be extended accordingly.
(e) The contracting officer deferred the issuance of the stop order for 4 days (October 26 to October 30) “* * * in the hope that we would probably be able to complete * * *» work.[29]
(f) Plaintiffs accepted the stop order and promptly ceased operations.
(g) As of October 30, 1951, plaintiffs had completed all of the work under Contract 8568 except (1) a line change at Broad Pass[30] and (2) the section between Potter and Anchorage. Of the latter, 4.7 miles of the 13.17 miles had been completed and were accepted; the first raise and the tie renewal had been completed for the entire distance; and *39 second raise bad been made (but not completed) on 2 additional miles.
26. (a) If tbe contractor bad been permitted to obtain ballast for tbe Potter to Anchorage work from either the Campbell pit[31] or tbe Anchorage Yard pit:
(1) It would have been able to commence ballasting operations on or about September 15.
(2) The use of 10 ballast cars, available by that date, would have been feasible.[32]
(3) As additional cars became available, greater volumes of ballast could have been hauled.[33]
(4) The moisture content of the ballast material would have been lower than was the moisture content of the gravel from Spencer pit, thereby reducing appreciably the difficulties actually encountered from freezing.[34]
(5) Operations, based on a steady and ample flow of ballast, would have been more efficient.[35]
(b) Plaintiffs had available the men and equipment requisite to the performance of the work based upon a steady and ample flow of ballast.
(c) Plaintiffs could have completed the work on the Potter to Anchorage section during the 1951 season if they *40 had been permitted to obtain ballast from the Anchorage Yard pit, or if there had been suitable ballast in the Campbell pit which they were permitted to use.
27. Plaintiffs’ carryover[36] to the 1952 work season included (1) the two unfinished portions under Contract 8568;[37] (2) part of the Anchorage Yard grading and drainage contract (which was begun in August 1951); and (3) part of a track relay contract at Fort Richardson. Plaintiffs were looking for additional work in Alaska to be performed in 1952.[38]
28. (a) On March 27, 1952, plaintiffs’ project manager forwarded to the contracting officer a detailed statement and analysis of losses alleged to have been sustained by the contractor as a result of the requirement imposed upon it to use the pit at Spencer in lieu of Campbell pit or the Anchorage Yard pit. The estimate of losses was limited to the period “prior to December 31, 1951,” with a second statement to follow for losses “incurred in performing the remaining work * * The estimate was predicated primarily on an alleged loss of efficiency of 49.8 percent “of our productive capacity.” As applied to the costs assembled in the statement, the loss was computed at $42,017.28, which the Railroad was requested to cover by a determination in the nature of an equitable adjustment.
(b) On April 18, 1952, the contracting officer replied to the project manager in equal if not greater detail, concluding as follows:
* * * we * * * differ very sharply on your present and proposed future claims. We contend that the delays you claim reimbursement for were not caused by any changes requested or instigated by The Alaska Railroad beyond the limits of the contract specifications and subsidiary agreements. We further claim that severe freezing weather, occurring much sooner than it does in ordinary years, caused the work delays, for which results the railroad is not responsible. * * *
*41 29. (a) Work on the Potter to Anchorage section was resumed on June 23, 1952, carried forward for 1 week, suspended from June 30 to July 6, resumed on July 7, and completed on August 6, for a total of 34 workdays.
(b)In connection with the foregoing work, plaintiffs subcontracted the loading of ballast, for which they paid $6,912.[39]
30. (a) In August 1953, a new contracting officer[40] discussed with plaintiffs’ corporate officer the claim filed by plaintiffs’ project engineer in March 1952,[41] suggested a revision downward by the elimination of some of the items, and offered to submit the claim (so revised) to the Comptroller General for pre-audit.
(b) On May 11, 1954, the Authorized Certifying Officer of the Department of the Interior submitted to the Comptroller General the “file on the claim” of plaintiffs, including therein a voucher in favor of plaintiffs in the amount of $28,380.58 which had been approved by the contracting officer, and requesting a decision as to whether the voucher could properly be certified for payment.
(c) On July 30, 1954, the Acting Comptroller General advised the Authorized Certifying Officer that the voucher could not be certified for payment.
(d) On August 9, 1954, the Assistant Solicitor of the Department of the Interior forwarded copies of the Comptroller General’s decision to plaintiffs with the advice that—
* * * the decision of the Comptroller General is final and you have no appeal to the head of the Department since the Secretary of the Interior is without authority to override a decision of the Comptroller General.
31. (a) The parties have stipulated that plaintiffs’ books and records disclose certain specified amounts as actual costs of performance, and that certain computations made by plaintiffs as “reconstructed” costs, i.e., what the costs of per *42 formance would have been, based on stated assumptions, are mathematically accurate.
(b) Among the stated assumptions is the proposition that, with respect to direct labor costs, the work between Potter and Anchorage could have been performed (if plaintiffs had had the use of either the Campbell pit or the Anchorage Yard pit) at unit costs identical with the unit costs of performing similar work between Wasilla and Cantwell. The evidence supports the assumption as valid in fact. It is therefore found that plaintiffs incurred increased costs of performance, in the nature of direct labor costs, in the amount of $30,192.43.
(c) Among the stated assumptions is the proposition that, with respect to the costs of operating equipment, plaintiffs’ cost of performance was $1,315.65 in excess of what the cost would have been if the contractor had had the use of either the Campbell pit or the Anchorage Yard pit. The assumption is supported as valid in fact by inferences reasonably to be drawn from the evidence, and the finding is entered accordingly.
(d) Among the stated assumptions is the proposition that, with respect to equipment costs, plaintiffs’ costs of performance were increased in the amount of $25,664.19 by reason of equipment idle time extending from various dates in October 1951 to sometime in the summer of 1952. This assumption is unsupported by evidence. The inferences reasonably to be drawn from the evidence as a whole are (1) that the equipment in question was stationed in Alaska for more or less permanent use; (2) that plaintiffs adjusted their costs to seasonal operations in that region; and (3) that, whatever accounting arrangements were made for the costs of equipment idle time, the costs now claimed were not charged to the work section of Potter to Anchorage. Therefore, it is not established by the evidence that plaintiffs’ costs of performance were increased by the cost of equipment idle time.
(e) Among the stated assumptions is the proposition that, with respect to field overhead, plaintiffs’ costs of performance were increased in the amount of $27,697.71, representing 239 calendar days at $115.89 per day, the time being *43 computed from October 18, 1951 (when plaintiffs contend they could have completed the work), to August 5, 1952 (when the work was actually completed), being a total of 293 days, from which was deducted 54 days representing the period from May 1 to June 24,1952, during which plaintiffs elected not to work on Potter to Anchorage because of their own convenience.
This assumption is unsupported by evidence. The inferences reasonably to be drawn from the evidence as a whole are: (1) that plaintiffs adjusted their costs to seasonal operations in Alaska; and (2) that whatever accounting arrangements were made for the costs of field overhead, the costs now claimed were not charged to the work section of Potter to Anchorage in excess of the 37 calendar days the job was in operation during the 1952 season. The finding therefore is that plaintiffs’ costs of performance in relation to field overhead were increased in the amount of $4,287.93.
(f) Among the stated assumptions is the proposition that the amount ($6,912) which plaintiffs paid, during the summer of 1952, for loading ballast at Moraine pit under subcontract, represented additional costs of performance. The assumption is unsupported by evidence. The finding therefore is that no such additional cost is established by the evidence.[42]
(g) Among the stated assumptions is the proposition that plaintiffs were subjected to increased costs of performance by reason of the application to such additional costs as may be established (for direct labor, equipment, and overhead) of (1) a bond premium of 1 percent and (2) the Alaska business tax of 0.5 percent. The assumption is unsupported by evidence.
32. An inference is reasonably to be drawn from the evidence that, if there had been no carryover of the Potter to Anchorage work to 1952, plaintiffs would not have incurred the expense of operating their equipment on the job (an item included hereinabove) and would have had the use (actual or rental) of such equipment elsewhere. Plaintiffs have made no claim for the use value of equipment in 1952, and *44 the evidence contains no basis for the determination of such value.
33. The total amount of plaintiff’s increased costs is found to be $35,769.01.
CONCLUSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are entitled to recover, and it is therefore adjudged and ordered that plaintiffs recover of and from the United States the sum of thirty-five thousand seven hundred ninety-six dollars and one cent ($35,796.01).

 The contractor was to load and dump the ballast. The Railroad provided the work trains, including operation as well as equipment.

 The court was “not convinced that the statements relied on by plaintiff can properly be interpreted as establishing a warranty * * but said that assuming the statements relied upon did constitute a warranty, “it would be ineffectual because made without authority.”

 The contracting officer, unlike the Government representative in Barling, supra, was not without authority to make a binding warranty.

 The Alaska Railroad is an agency of the Department of the Interior.

 Each set of specifications contained the standard provisions relating to visit to site and control of the work, as follows: “visit to site — Bidders should fully inform themselves as to the location and the nature of the work, climate, conditions, terrain, nature and size of vegetation on the site; existing structures; local and general availability of water, fuel and power; size, type and availability of equipment required to perform the work ; and other matters of local nature which might affect the eost of the work. Failure to take this precaution will not relieve the successful bidder from furnishing all materials, labor, equipment and supplies necessary to complete the contract without additional cost to the Government.” From General Requirements, Paragraph 1-20, Contract No. 8567; Paragraph 1-7, Contract No. 8568.
“control on the work (Authority of Engineer) — All work shall be done under the direct supervision of the Engineer and his authorized assistants. To prevent misunderstanding and litigation, the Engineer shall decide any and all questions which may arise as to the quality and acceptability of the materials furnished and work performed and as to the manner of performance and rate of progress of said work, and shall decide all questions which may arise as to the interpretation of any or all plans relating to the work and of the specifications, and all questions as to the acceptable fulfillment of the contract on the part of the Contractor, and such decision shall be final and conclusive, except that the Contractor shall not be stopped from resorting to legal process in the event that the decision of the Engineer with respect to the matters above enumerated is not acceptable.” From General Requirements, Paragraph 1-24, Contract No. 8567; Paragraph 1-21, Contract No. 8568.
Each of the contracts likewise contained the following standard provision relating to inspection: article 6. Inspection.- — (a) All material and workmanship (if not otherwise designated by the specifications) shall be subject to inspection, examination, and test by Government inspectors at any and all times during manufacture and/or construction and at any and all places where such manufacture and/or construction are carried on. The Government shall have the right to reject defective material and workmanship or require its correction. Rejected workmanship shall be satisfactorily corrected and rejected material shall be satisfactorily replaced with proper material without charge therefor, and the contractor shall promptly segregate and remove the rejected material from the premises. If the contractor fails to proceed at once with the replacement of rejected material and/or the correction of defective workmanship the Government may, by contract or otherwise, replace such material and/or correct such workmanship and charge the cost thereof to the contractor, or may terminate the right of.the contractor to proceed as provided in article 9 of this contract, the contractor and surety being liable for any damage to the same extent as provided in said article 9 for terminations thereunder.

 The William A. Smith Contracting Company, Inc., is a Missouri corporation. Brown & Root, Inc., is a Texas corporation.

 Specifications, General Requirements, Paragraphs 1-7 to 1-12.

 Specification, General Requirements, Division 2, Paragraphs 2-1 and 2-2.

 Specifications, General Requirements, Division 2, Paragraph 2-1.

 Contract 8567, Specifications, General Requirements, Division 2, Paragraph 2-17. Contract 8568, Specifications, General Requirements, Division 2, Paragraph 2-23A.

 Specifications, General Requirements, Division 3, Paragraph 3 — 6.

 Specifications, General Requirements, Division 2, Paragraph 2--23(c) and (d).

 Specifications, General Requirements, Division 2, Paragraph 23(e).

 “Borrow” as distinguished from “ballast’’ was used in bank widening rather than in track raising. Bank widening pertained to the subsurface embankment which supported ties, rails, and ballast.

 One line change (involving the construction of new track) was made in work section 6 during the 1950 season. 'Some of the bqllast was obtained from the Campbell (Turnagain) pit.

 The contracting officer on both contracts was the Chief Engineer of the Alaska Railroad.

 The president of William A. Smith Contracting Company, Inc., held a formal power of attorney-in-fact from Brown & Root, Inc., and acted throughout as the corporate officer of the joint venturers.

 Three other Items, not material here, were specified in the Potter to Anchorage section, for a consideration of $12,742, making the total of the proposed outlay on this section, $192,514.

 These sections were: (1) Portage to Kern, MP 64.80 to 71.04; (2) Kern to Indian, MP 71.04 to 88.S) ; (3) Indian to Potter, MP 88.3 to 100.8; and (4) Potter to Anchorage, MP 100.8 to 113.97. They thus included the whole of the 49.17 miles from Portage to Anchorage. Spencer, from which was drawn the name of the Spencer pit, was at milepost 55.8, being 9 miles south of Portage.

 As the work eventuated, the 13.17 miles of track between Potter and Anchorage were included, while the 36 miles of track south of Potter (to Portage) were eliminated.

 Attached to It as “justification” on the part of the Railroad was a statement excerpted from the letter quoted in finding 11(a).

 This fact is conceded by the parties. Otherwise, its establishment rests upon matters de hors the written contract, including the correspondence and course of conduct of the parties.

 The inferences reasonably to be drawn from the evidence as a whole are: (1) that the contract documents (Supplemental Agreement No. 3 to Contract 8567 and Supplemental Agreement No. 4 to Contract 8568) were drawn by the Railroad; (2) that the Railroad, in preparing such documents, centered attention upon (a) the accounting between it and the contractor and (b) specifying the worh to be done, without any special consideration of the contractual terms from the contractor’s standpoint; and (3) that the contractor, having satisfied itself as to the accounting, and being content with the oral discussions of what work was to be done and how it was to be done, signed the contract documents without analyzing them for possible deficiencies from the contractor’s standpoint.

 Three other bars indicated the use of specified pits in relation to specified sections of the work.

 The embankment was approximately 50 feet iiigb and 800 feet long.

 Plaintiffs used 40,498 cubic yards of ballast in the Potter to Anchorage section. The Railroad had estimated the quantity available in the Campbell pit as 55,000 cubic yards. While the estimate was proved to have overshot the mark, the quantity of acceptable material exceeded the needs of the Potter to Anchorage work.

 Another contractor was working on the 11.9-mile section immediately south of Potter, under this contract the Railroad had undertaken to furnish ballast loaded in cars at the jobsite. The contract did not specify Campbell pit as the source of ballast.

 All of plaintiffs’ needs, for the Yard’s grading and drainage and for the Potter to Anchorage work, could have been supplied from this pit without such encroachment. The contracting officer appears to have been cautious without specific check of the potential.

 As part of the same caution, the contracting officer had made allowance for withdrawals from the pit to serve the needs of the grading and drainage contract, but was unwilling to extend the allowance to cover the Potter to Anchorage work.

 The use of a dragline instead of a shovel was made necessary by the screening requirement.

 Plaintiffs used an average of 3,075 cubic yards per mile. The 17,473 cubic yards would therefore provide for approximately 5.65 miles of the 13.17-mile stretch between Potter and Anchorage. In actual use, the ballast was spread over a greater distance. See finding 25 (g).

 There was little or no frost in the area on October 24 through October 28.

 This work was under subcontract. The parties have stipulated that the failure of plaintiffs and their subcontractor to complete the line change is not material to plaintiffs’ recovery for delay in the Potter to Anchorage section. Plaintiffs have made no claim with respect to the line change.

 For the purposes of this finding it is assumed that the Campbell pit had not been disturbed, and was, on September 1, in the same condition as it was on June 1.

 With 5 cars hauling and 5 cars dumping, the 10 ballast cars could have provided 175 cubic yards per trip. (The average haul out of Spencer pit was approximately 35 cubic yards per car.) Ten trips per day from either Campbell pit or the Anchorage Yard pit would have delivered 1,7,50 cubic yards. At this rate, 24 working days (to October 13) would have been required to haul the 40,498 cubic yards used in the job.

 In the operation out of the Spencer pit, 77 separate ballast cars were available by October 3. It is doubtful if that many cars could have been used efficiently out of the Campbell pit or the Anchorage Yard pit. Forty cars probably would have been ample at either pit. The pit foreman could load (without screening) from 10 to 12 cars per hour. An average of 10 trips per day, with 350 cubic yards per trip, would have enabled plaintiffs to supply their total need (40,498 cubic yards) in less than 2 weeks.

 In the operations out of Spencer pit, empty cars arrived at Spencer in late afternoon or early evening. Loading was commenced immediately, to have a work train moving toward the jobsite for use the next day. Ballast material thus remained in the cars overnight, exposed to the cold. This condition need not have occurred on hauls out of Campbell or Anchorage Yard, unfrozen ballast material could have been compacted with less effort and with less chance that it would freeze quickly after it was in place.

 In the operation as performed, track crews were sometimes idle while waiting for ballast, some men had to be laid off for lack of work, and some extra work resulted when ties which had skewed for lack of ballast had to be respaeed.

 This was as of October 30, 1951.

 On November 14, 1951, the completion date of Contract 8568 was extended to September 30, 1952.

 On July 7, 1952, the Railroad’s Assistant Chief Engineer, in a letter to the contractor’s project engineer, confirmed four items of unfinished work under Contract 8568, totaling $205,950, of which the unfinished portion of the Potter to Anchorage section accounted for $99,265.

 This 'was a transaction with the Railroad, involving use of the Moraine pit, near Portage, instead of the pit at Spencer. The availability of the Moraine pit, and the feasibility of the new arrangement based thereon, were unknown before the summer of 1952, and were therefore not in contemplation when operations were suspended in 1951.

 The former Chief Engineer had been succeeded by the Assistant Chief Engineer who, by reason of his succession, became the contracting officer.

 Finding 26(a).

 If the plaintiffs had been permitted to use the Campbell pit, their costs for gravel and pit trackage would have been approximately the same as their costs for the Moraine pit.